Argued and submitted November 20, 1998, affirmed May 19, 1999

# Jeremy E. LEE,
## *Petitioner,*

*v.*

# APPRAISER CERTIFICATION AND
# LICENSURE BOARD,
## *Respondent.*

## (96-09-002; CA A99750)

981 P2d 825

Edward S. McGlone argued the cause for petitioner. With him on the briefs was Wallace, Klor & Mann, P.C.

Richard D. Wasserman, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Armstrong and Brewer,* Judges.

BREWER, J.

---

* Brewer, J., *vice* Warren, P. J., retired.

**BREWER, J.**

Petitioner seeks review of a final order on reconsideration[1] of the Appraiser Certification and Licensure Board in a contested case proceeding based on his unlicensed practice of real estate appraisal activity. ORS 674.100. The Board held petitioner in violation and imposed a total civil penalty of $8,600 for 18 separate violations. Petitioner contends that the Board erroneously interpreted the statutory term "real estate appraisal activity" in ORS 674.100(1)(a),[2] and its definition in ORS 674.100(1)(b),[3] to apply to his conduct. He further argues that, if the Board's interpretation of the term is correct, then the statute is preempted by federal law. Next, petitioner contends that his conduct was authorized under the Board's rules. Finally, petitioner asserts that the Board's decision was not supported by substantial evidence. We affirm.

■ The Board made extensive findings of fact in its final order on reconsideration. All but one of those findings are unchallenged and, therefore, are binding on judicial review. *Meltebeke v. Bureau of Labor and Industries*, 322 Or 132, 134, 903 P2d 351 (1995). The Board's undisputed findings of fact are as follows:[4]

> "[Petitioner] is a licensed appraiser in Montana. Since March 1993, he has assisted in the preparation of appraisals in California and Washington, under the supervision of a licensed appraiser. In California and Washington,

---

[1] The Board issued its initial final order on August 27, 1997, following a contested case hearing process. After petitioner sought review of that order, the Board withdrew the order. The Board subsequently issued its final order on reconsideration on May 20, 1998. Thereafter, petitioner filed an amended petition for review of the final order on reconsideration.

[2] ORS 674.100(1)(a) provides that

"[n]o person shall engage in, carry on, advertise or purport to engage in or carry on real estate appraisal activity within this state without first obtaining certification or licensure as provided for in ORS 674.310."

[3] ORS 674.100(1)(b) defines the term "real estate appraisal activity" to mean "the preparation, completion and issuance of an opinion as to the value on a given date or at a given time of real property * * *."

[4] Although they are lengthy, we take the unusual step of reciting the Board's findings verbatim in order to fully ground our discussion of petitioner's assignments of error.

appraisal licensure is voluntary. In Oregon, licensure is mandatory. In California and Washington, [petitioner] signed reports as the appraiser.

"Montana and Oregon entered into a reciprocal agreement in 1995, which provided for licensure in Oregon of appraisers licensed by Montana. The agreement required Montana's appraiser regulatory agency to provide, among other things, the expiration date of the appraiser's license and a certificate of good standing.

"In February 1996, [petitioner] was hired by C & L Appraisals (C & L), which is owned by Laurie Egan (Egan). She is an Oregon licensed appraiser, who has been an appraiser for 10 years. Egan employs a total of four appraisers, including herself, and a bookkeeper. She works out of her * * * office.

"C & L established an office in the Eugene area. Beginning in March 1996, [petitioner] worked out of C & L's Eugene office and prepared appraisals under Egan's supervision. For the first month, he worked on salary. Thereafter, he worked on a fee-split or commission. C & L charged $300 for a residential appraisal, whether it is a summary or a self-contained report.

"[Petitioner] inspected the properties, took photographs, conducted a market survey of comparable properties in the area, compiled and verified the data and drafted the appraisal reports. Egan traveled to Eugene and reviewed [petitioner's] work, revising the reports if necessary, and signing the reports. Egan signed as the 'supervising appraiser.' Egan had the final say on the value of the properties. * * * All of the appraisals prepared by [petitioner] involved federally related transactions.

"If the lender needed clarification, [petitioner] would prepare a supplemental addendum and Egan would review it before it was distributed. Two of the supplemental addenda were signed only by [petitioner]. One of the addenda clarified the address of the property and one clarified the water source.

"Sometimes [petitioner] would fax or mail his draft of the appraisal report to Egan. She would review the reports, make any necessary changes, sign the report and issue it. No report was distributed to the lender until Egan signed

the appraisal and personally authorized its release. However, all the reports in evidence were distributed with [petitioner's] consent and [petitioner's] signature affixed. In completing and distributing the reports, [petitioner] certified the reports and made the following statements:

"1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

"2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

"3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

"4. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

"5. I have no present or contemplated future interest in the subject property, and neither my current or future

employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

"6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, or the need to approve a specific mortgage loan.

"7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

"8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

"9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report,

I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this report. I certify that any person so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report, therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it. * * *

"Many of these appraisals were created for Mortgage Market. When Egan signed these reports, she made the following statement:

"I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4-7 above, and am taking full responsibility for the appraisal report.

"Without Egan's signature, the appraisals would have been rejected by the lender, Mortgage Market, and the loans would not have been funded. All of the loans were funded. A few times, Mortgage Market brought appraisals to Egan's office in Tigard to have her sign the reports. The competency of the reports was not an issue in this matter.

"Egan did not initially inspect the properties; after a reviewing appraiser informed Egan that her failure to inspect the properties may violate the USPAP, Egan inspected all of the pending properties to be appraised and included a certification that she had done so.

"[Petitioner] prepared these reports by compiling the data therein. [Petitioner] also analyzed and reconciled that data to arrive at an opinion of value in each of the 18 reports. Each of the 18 reports was distributed to the client with [petitioner's] signature and his consent.

"On April 15, 1996, [petitioner] applied for a state certified residential appraiser license under the reciprocal agreement with Montana. Along with his application, he submitted a copy of his Montana license. He asked Montana's appraiser regulatory agency to send his test scores and a letter of good standing to ACLB. Montana's appraiser regulatory agency sent the information requested, which was received by ACLB on April 23, 1996, but failed to include the expiration date of [petitioner's] Montana

license. It also failed to include a certificate of good standing. The ACLB told [petitioner] that it would not process his appraiser license application until Montana sent that information. On July 8, 1996, ACLB received the expiration date information regarding [petitioner] from Montana.

"The Uniform Standards of Professional Approval Practice (USPAP) is a publication of the Appraisal Standards Board (ASB), which contains the standards of professional appraisal practice and advisory opinions. The USPAP standards have been adopted by ACLB. OAR 161-25-060. The advisory opinions are published as part of the USPAP publication. They illustrate the applicability of appraisal standards in specific situations and offer advice for resolution of appraisal issues and problems." (Footnotes omitted.)

Petitioner makes seven separate assignments of error, five of which merit discussion. The first two assignments of error state the same argument differently, namely, that the Board erroneously interpreted the statutory term "real estate appraisal activity" in ORS 674.100(1)(a), and its definition in ORS 674.100(1)(b), to apply to petitioner's conduct. We review such claims for errors of law. ORS 183.482(8)(a). Petitioner acknowledges that he assisted in the preparation of the 18 cited reports but argues that he did not "complete" or "issue" them. Therefore, he contends that he did not engage in proscribed unlicensed appraisal activity.

█ In defining the term "real estate appraisal activity," the legislature did not further define the words "preparation," "completion," and "issuance." However, we agree with the Board that the words chosen by the legislature may be interpreted based on their text and context, which is the first step in the process of statutory interpretation prescribed in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). The words "preparation," "completion," and "issuance" do not appear to be used in any technical sense apart from their plain, natural and ordinary meaning. The Board correctly compiled the dictionary definitions of those words:

"The word 'preparation' is defined to include, as relevant here, 'the action or process of making something ready for use or service; the action or process of putting something

together.' *Webster's Third New Int'l Dictionary* 1790 (unabridged ed 1986). As pertinent here, 'completion' means 'the act or action of completing, becoming complete, or making complete.' *Id.* at 465. The word 'complete' means 'to bring to an end often into or as if into a finished or perfected state; to make whole, entire, or perfect; end after satisfying all demands or requirements.' *Id.* 'Issuance' means 'the act of officially putting forth or getting out or printing or making available or distributing or giving out or granting or proclaiming or promulgating; the act of bringing out for distribution to or sale or circulation among the public; publication; the condition or fact of being produced or made available by such action.' *Id.* at 1201."

Petitioner contends, however, that the Board erroneously extrapolated from those definitions when it concluded as follows:

" 'Based on these definitions, we conclude that 'preparation,' as used in ORS 674.100(1)(b), means gathering or compiling the data (including reviewing and adopting such compiled data as one's own) regarding the subject property or properties. 'Completion' means interpreting, analyzing and reconciling the data (including reviewing and adopting such interpretation, analysis and reconciliation of the data as one's own) to arrive at an opinion of value of real property. 'Issuance' means the distribution of the opinion of value orally or in writing. In the case of an unlicensed person who assists a licensed appraiser, 'issuance' does not include merely the expression of an opinion of value to the licensed appraiser as part of the preparation of an appraisal report.' "

■    We disagree with petitioner's contention. A literal recital of the dictionary definitions of the words ignores their context within the framework of the appraisal regulation statutes. We agree with the Board that petitioner "completed" the reports.[5] In each report, petitioner expressly certified that he personally prepared all conclusions and opinions about the real estate that were included in the report.

_____

[5] On that question, the Board concluded:

"There can be no doubt that [petitioner] prepared the appraisal reports by compiling the data and putting the reports together. He also completed those reports, by interpreting, analyzing and reconciling the data to arrive at an opinion of value, and setting forth his analysis and opinion in a completed report."

Even when Egan modified them, the reports were each distributed with petitioner's consent. The Board's interpretation conforms to petitioner's own description of his activity and is sensible in light of the certifications made by petitioner to his clients. Likewise, we agree with the Board's conclusion that petitioner issued the reports:

> "We also conclude that [petitioner's] conduct involved 'issuance' of an opinion of value of real property. An initial question on this point is the significance of the fact that a completed appraisal report would not be distributed to the client until Egan reviewed, revised if necessary, and co-signed the report, and authorized its release. [Petitioner] contends that this fact is dispositive, on the theory that only the person with final authority over the distribution of the report may be said to 'issue' the report.

> "However, Egan's signature does not excuse [petitioner's] actions. We have found that, after Egan signed the reports as the 'supervising appraiser' and authorized their release, [petitioner] then signed the reports himself as the 'appraiser.' Through his signature, [petitioner] purported to take personal responsibility for the content, analyses and opinions of value stated in the reports. All of the reports in evidence thus were distributed to the client with [petitioner's] signature, consent, and knowledge that they would be so distributed. Moreover, by the terms of [petitioner's] certification statement in each of the reports it is clear that he took full responsibility for the analysis and the opinion of value in each of the appraisals, just like an appraiser.

> "In these circumstances, Egan's veto power over the reports is not dispositive. By signing the reports to be distributed to the client, explicitly identifying himself as the 'appraiser,' [petitioner] expressed his own opinions of value of real property and distributed those opinions to the client. In so doing, he 'issued' opinions of value of real property within the meaning of ORS 674.100(1)(b)." (Footnotes omitted.)

Petitioner signed the reports as "appraiser." Even though Egan had the final say in the reports' release, the essential work was petitioner's and he so certified. By his signature and his numerous certifications, petitioner did proclaim, publish and promulgate the reports. His conduct fell well within the range of the plain natural and ordinary

meaning of "issuance." The Board's interpretation did not distort that meaning. The Board's conclusions that petitioner completed and issued the reports were not erroneous.

Petitioner next contends that federal law, specifically 12 USC, section 3351(e), preempts ORS 674.100(1)(a), as interpreted by the Board.[6] The parties agree that the federal statute applies to the transactions at issue here. 12 USC, section 3351(e), provides, in part:

"An individual who is not a State certified or licensed appraiser may assist in the preparation of an appraisal if—

"(1)   the assistant is under the direct supervision of a licensed or certified individual; and

"(2)   the final appraisal document is approved and signed by an individual who is certified or licensed."

The Board determined that the federal statute does not conflict with ORS 674.100(1)(a):

"Contrary to [petitioner's] contention, however, Oregon law does not conflict with the federal statute. ORS 674.100(1)(a) makes it unlawful for an unlicensed person to carry on 'real estate appraisal activity.' ORS 674.100(1)(b) defines 'real estate appraisal activity' as the 'preparation, completion *and* issuance' of an opinion of value of real property. [Petitioner] correctly asserts that, for conduct to be 'real estate appraisal activity,' all three elements—preparation, completion, and issuance—must be present.

"Thus, Oregon law does not make it unlawful for an unlicensed person merely to 'assist in the preparation of an appraisal': the conduct protected by federal law in specified circumstances. Because Oregon law does not prohibit conduct protected by federal law, there is no conflict and, therefore, no preemption." (Emphasis in original.)

We review the Board's conclusions that the statutes are not in conflict for errors of law. ORS 183.482(8)(a). We agree with the Board that there is no conflict between the

---

[6] That statute was enacted by Congress as part of the Financial Institutions Reform and Recovery Act of 1989 (FIRREA). As petitioner observes, the Oregon Legislature revised our appraisal statutes in 1991 to promote harmony with the federal legislation. *See* ORS 674.020(2); ORS 674.130.

federal and state legislation as petitioner claims. Petitioner cites no authority, and we have found none, that holds that the federal legislation countenances appraisal assistants holding themselves out as appraisers in issuing reports to clients. The Board did not penalize petitioner for *assisting* in the preparation of appraisals. He was penalized for the preparation, completion, *and* issuance of appraisal reports.

In his fourth assignment of error, petitioner contends that the Board's own rules, which incorporated the Uniform Standards for Professional Appraisal Practice (USPAP), authorized the conduct in which he engaged. We review the Board's interpretation of its own rules for error of law. We defer to an agency's interpretation of its own rules if it cannot be shown either to be "inconsistent with the wording of the rule itself, [or] with the rule's context, [or] with any other source of law." *Ulrich v. Senior and Disabled Services Div.*, 142 Or App 290, 296, 921 P2d 982, *rev den* 324 Or 323 (1996).

Petitioner relies on OAR 161-025-0060(6), which provides:

> "The 'Uniform Standards of Professional Appraisal Practice,' 1996 Edition, approved and adopted by the Appraisal Standards Board of the Appraisal Foundation, dated April 27, 1987, as amended on January 1, 1996, are incorporated into the Administrative Rules of the Appraiser Certification and Licensure Board as the standards of professional conduct which shall guide the behavior of licensed and certified appraisers in the State of Oregon."

The Board interpreted that rule as follows:

> "The USPAP is a publication of the Appraisal Standards Board (ASB), which contains the standards of professional appraisal practice and advisory opinions. The USPAP standards have been adopted by ACLB, OAR 161-[0]25-[0]060. The advisory opinions are published as part of the USPAP publication. They illustrate the applicability of appraisal standards in specific situations and offer advice for resolution of appraisal issues and problems."

Petitioner argues that subsection (6) of the rule incorporates the "Uniform Standards of Professional

Appraisal Practice" in their entirety, including advisory opinions. One of those advisory opinions, G-5, states:

> "As proficiency is demonstrated by an assistant, it is appropriate for the principal appraiser to place greater reliance on the work of that assistant. An assistant who has meaningful appraisal education and extensive work experience may well be competent to inspect the real estate and prepare the appraisal report alone, subject to an appropriate final reconciliation by the principal appraiser who will be signing or co-signing the report. The appropriate final reconciliation should include a discussion of all aspects of the appraisal process between the assistant and the principal appraiser.

> "If the principal appraiser signs the report alone, the contribution of the assistant must be acknowledged (Standards Rule 2-3) and the specific tasks performed by the assistant should be clearly stated. If both the assistant and principal appraiser co-sign the report, the principal must accept full responsibility for all aspects of the appraisal process as evidenced by the contents of the report (Standards Rule 2-5). In no circumstance is it appropriate for the principal appraiser to merely sign an appraisal report prepared by an assistant."

■ The Board's refusal to conclude that the proffered advisory opinion authorized petitioner's conduct was not erroneous for two independent reasons: (1) The advisory opinion is preceded by a disclaimer that provides that it "does not establish new standards or interpret existing standards." That disclaimer is consistent with the fact that the opinion refers to an assistant's co-signing a report without authorizing such conduct; and (2) OAR 161-025-0030(3), another Board rule, prohibits assistants from signing appraisal reports. The Board properly harmonized its rules. Petitioner's interpretation of the advisory opinion would unnecessarily place it in direct conflict with another agency rule.

Although petitioner makes three additional assignments of error, only one of those, the seventh, merits further discussion. There, petitioner challenges the following finding of fact made by the Board: "We have found that, after Egan

signed the reports as the 'supervising appraiser' and authorized their release, [petitioner] then signed the reports himself as the 'appraiser.' "

Petitioner contends that the finding misstates undisputed evidence to the contrary. He argues that Egan always signed the reports last. Petitioner testified that he signed the appraisals before Egan signed them. The Board contends that its finding to the contrary was supported by substantial evidence. We conclude that it is not necessary to resolve that question.

Regardless of whether it was adequately supported, the finding was not critical to the Board's conclusion that petitioner issued the reports. The Board's conclusion that petitioner *issued* the reports does not ultimately depend on whether he signed them last. Although the Board did discuss its finding that petitioner signed last, it concluded:

"In these circumstances, Egan's veto power over the reports is not dispositive. By signing the reports to be distributed to the client, explicitly identifying himself as the 'appraiser,' [petitioner] expressed his own opinions of value of real property and distributed those opinions to the client. In so doing, [petitioner] 'issued' opinions of value of real property within the meaning of ORS 674.100(1)(b)."

As we have already said, the Board's conclusion that petitioner "issued" the reports was not erroneous. Therefore, petitioner's evidentiary challenge would not require reversal even if it was well taken. *Pac. Motor Trucking Co. v. Bur. of Labor*, 64 Or App 361, 368, 668 P2d 446, *rev den* 295 Or 773 (1983).

For the foregoing reasons, the Board's final order on reconsideration is affirmed.

Affirmed.