Argued and submitted November 9, 2001, Hood River High School, Hood River, affirmed December 11, 2002

Nancy L. POWELL,
an individual,
Remington Powell, a minor,
through his Guardian ad Litem Nancy L. Powell,
*Appellants,*

*v.*

Stan BUNN,
individually and as Superintendent of Public Instruction;
Portland Public School District No. 1J,
*Respondents.*

9805-03567; A108090

59 P3d 559

Andrea R. Meyer argued the cause for appellants. With her on the briefs was Paul R. Meyer.

Janet Metcalf, Assistant Attorney General, argued the cause for respondent Stan Bunn. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

William H. Walters argued the cause for Portland Public School District No. 1J. With him on the brief were Jeffrey B. Millner and Miller Nash, LLP.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

LINDER, J.

## LINDER, J.

The Portland Public School District (district) allows community organizations to use school facilities, subject to certain restrictions. The Pacific Cascade Council of the Boy Scouts of America (Boy Scouts) is one of the organizations that takes advantage of that policy. For schools underserved by scouting programs, particularly those with disadvantaged student populations, the Boy Scouts engages in an outreach program designed to encourage interested school-aged boys to join the Boy Scouts. Plaintiff is the mother of a boy enrolled in one of the district's schools. Plaintiff brought these proceedings in circuit court to challenge the district's policy of permitting the Boy Scouts to make in-school membership presentations to students, contending that the Boy Scouts is a religious organization whose in-school activities violate state constitutional and statutory prohibitions of governmental establishment of religion. The circuit court rejected plaintiff's challenges. Plaintiff appeals, and we affirm.

## I. BACKGROUND

### A. *Procedural Posture*

Before describing the factual circumstances that gave rise to this dispute, it is helpful to clarify the procedural posture of the case and the nature of the record before us. To raise her objections to the Boy Scouts' access to public schools, plaintiff filed a complaint with the Superintendent of Public Instruction (superintendent)[1] alleging a violation of ORS 327.109.[2] In it, plaintiff asserted that the district, by

---

[1] The order was issued by then-Superintendent Norma Paulus. While this case was pending in circuit court, she was succeeded in office by Superintendent Stan Bunn, who was substituted as the defendant in the judicial review proceeding. Because of that substitution, we refer to the superintendent's actions as though they were those of Superintendent Bunn.

[2] ORS 327.109 provides, in part:

"(1) Upon receipt from a citizen of Oregon of a complaint that on its face is colorable that a school district * * * is a district * * * that sponsors, financially supports or is actively involved with religious activity, the Superintendent of Public Instruction or the superintendent's designated representative shall undertake promptly a preliminary investigation of the facts alleged in the complaint.

permitting the Boy Scouts to present membership information to boys on school premises, "sponsors, financially supports or is actively involved with religious activity." In response, the superintendent conducted a preliminary investigation, after which he issued an order entitled "Finding of Preliminary Investigation." The superintendent concluded in that order that there was no substantial basis to believe that the district was impermissibly involved with religious activity. He therefore declined to hold a contested case hearing to determine whether state funding should be withdrawn from the district, which is the sanction that the statute provides if a complaint is well founded.

Plaintiff sought judicial review of the superintendent's order in circuit court pursuant to the procedures for review of an order in other than a contested case. *See* ORS 183.484. In her complaint, she also pleaded claims for civil declaratory and injunctive relief against the district, alleging that the district's policy and practice of permitting the Boy Scouts to have access to its schools to encourage membership in their organization violates the Oregon Constitution's prohibition against an establishment of religion. By way of relief on those claims, plaintiff sought an injunction prohibiting the district from continuing to allow the Boy Scouts to present membership information to students on public school premises.

---

"(2) If, after the preliminary investigation, the superintendent finds that there is a substantial basis to believe that the school district * * * sponsors, financially supports or is actively involved with religious activity, the superintendent shall:

"(a) In the case of a school district:

"(A) Notify the complainant and the school district;

"(B) Withhold immediately all funds due the school district under ORS 327.095; and

"(C) Schedule a contested case hearing to be conducted in accordance with ORS 183.413 to 183.470.

"* * * * *

"(3)(a) In the case of a school district if, after the preliminary investigation, the superintendent finds that there is no substantial basis to believe that the school district is a district that sponsors, financially supports or is actively involved with religious activity, the superintendent shall notify the complainant and the district of that finding and shall not withhold funds due the district under ORS 327.095 or schedule a hearing."

All parties moved for summary judgment in their favor in the respective actions. The circuit court granted summary judgment in favor of each defendant in the two actions and denied plaintiff's motions for summary judgment. On appeal, plaintiff assigns error to the grant of summary judgment for each defendant and the denial of summary judgment in her favor. *See To v. State Farm Mut. Ins.,* 123 Or App 404, 410, 860 P2d 294 (1993), *aff'd in part, rev'd in part on other grounds,* 319 Or 93, 873 P2d 1072 (1994).

The procedural posture of the case is important for its bearing on our standard of review. The standard of review for cross-motions for summary judgment is a familiar one. Each party that moves for summary judgment has the burden of demonstrating that there are no material issues of fact and that the movant is entitled to judgment as a matter of law. *McKee v. Gilbert,* 62 Or App 310, 321, 661 P2d 97 (1983). The trial court must view the evidence and all reasonable inferences it may support in the light most favorable to the nonmoving party and determine whether the moving party, despite that view of the evidence, is entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.,* 325 Or 404, 420, 939 P2d 608 (1997). On appeal, the trial court's "standard for decision" becomes our standard of review. We therefore review the evidence and all reasonable inferences in the light most favorable to the nonmoving party and determine whether the moving party is entitled to judgment as a matter of law. *Jones,* 325 Or at 420. In the case of cross-motions for summary judgment, we determine which party is entitled to judgment as a matter of law. *Stevens v. Bispham,* 316 Or 221, 223, 851 P2d 556 (1993).

That standard of review applies without difficulty to the judgment for the district on plaintiff's civil claim for declaratory and injunctive relief. But it is not appropriate for the judgment in favor of the superintendent on judicial review of the superintendent's administrative order. The circuit court's charge in that proceeding was to test the superintendent's factual determinations for "substantial evidence," which meant that the circuit court was to decide only whether "the record, viewed as a whole, would permit a reasonable person to make" the factual findings that the superintendent made. ORS 183.484(5)(c). On appeal, our

function is to determine whether the circuit court correctly applied the standards of its review under ORS 183.484. *Teel Irrigation Dist. v. Water Resources Dept.*, 135 Or App 16, 23, 898 P2d 1344 (1995), *aff'd in part and vac'd in part*, 323 Or 663, 919 P2d 1172 (1996). Our review of factual issues, then, is limited to whether the circuit court correctly decided that the order is supported by substantial evidence. *United Citizens v. Environmental Quality Comm.*, 104 Or App 51, 54, 799 P2d 665 (1990), *rev den*, 311 Or 151 (1991).[3] In short, the general standards for summary judgment—and, in particular, viewing factual disputes in the light most favorable to a nonmoving party—are not appropriate in the judicial review of an administrative order in a noncontested case proceeding.

■■ As a practical matter, the procedural posture of the proceeding reviewing the superintendent's order does not impair our ability to review the circuit court judgment, because the issue ultimately is a legal one only.[4] In the circuit court, plaintiff did not challenge any of the superintendent's factual findings as unsupported by the record, and she does not do so on appeal.[5] The crux of her argument is that the superintendent incorrectly interpreted the legal standards that should apply to her challenge. The same argument forms the centerpiece of her position with respect to her civil

---

[3] ORS 183.500 provides that an appeal of a circuit court judgment following judicial review of a noncontested case order "shall be taken in the manner provided by law for appeals from the circuit court in suits in equity." The reference to equitable proceedings is an anachronistic holdover from earlier provisions of the administrative review statutes. *Oregon Env. Council v. Oregon State Bd. of Ed.*, 307 Or 30, 38, 761 P2d 1322 (1988). As we have observed in other cases, the practical import of that standard as it bears on our review is not altogether clear. *See, e.g., Portello v. Oregon State System of Higher Education*, 122 Or App 314, 318 n 1, 858 P2d 145, *rev den*, 318 Or 170 (1993).

[4] In implicit recognition of that reality, the parties effectively have ignored the usual summary judgment standard of review insofar as the superintendent's order is concerned and have cited the standard of review articulated in *United Citizens*, 104 Or App at 54.

[5] We qualify that observation slightly. Plaintiff includes in her arguments a passing challenge to the superintendent's factual findings, arguing that some of them are not supported by substantial evidence because the superintendent inadequately investigated plaintiff's complaint. The legal basis for the argument is inadequately developed. In all events, we agree with the superintendent that the proper question is whether the record would permit a reasonable person to make the factual findings that the superintendent made. *See* ORS 183.484(5)(c). Plaintiff does not argue that any of the superintendent's findings is unsupported under that standard.

declaratory and injunctive action, where summary judgment was an appropriate procedural mechanism to invoke, but the parties were (and remain) in agreement that there were no disputed issues of material fact. Thus, although the standards of review that apply to the civil action and the review proceeding differ, ultimately they converge, because the inquiry for both is legal only. We therefore review the cross-motions for summary judgment in plaintiff's civil action for declaratory judgment and injunctive relief to determine which party—plaintiff or the district—was entitled to judgment as a matter of law, which entails reviewing whether the trial court correctly applied the law to the facts. We review the judgment in favor of the superintendent on review of his order to determine if the trial court correctly interpreted and applied the correct legal standards. *Teel Irrigation Dist.*, 135 Or App at 23.

## B. *The Facts*

Pursuant to what appears to have been the mutual agreement of all concerned, the trial court treated the superintendent's order, together with affidavits, exhibits, and documentation submitted in support of the summary judgment motions, as a single record on which both proceedings (*i.e.*, the civil action and the review proceeding) should be resolved. The record before us for our review therefore consists of the express factual findings in the superintendent's order, together with the evidentiary record developed by the combined summary judgment submissions.[6] Although the parties disagree as to the legal significance of certain facts, the pertinent facts themselves are not disputed.

---

[6] The manner in which the record was developed by the parties and considered by the circuit court is consistent with *Norden v. Water Resources Dept.*, 329 Or 641, 996 P2d 958 (2000). In that case, the Supreme Court held that judicial review of an order in other than a contested case, as provided for by ORS 183.484, is a record-making proceeding. *Norden*, 329 Or at 646-49. A party challenging the order therefore may present evidence that detracts from the agency's order and the agency, conversely, may present evidence bolstering its order. *Id.* To the extent that a plaintiff does not seek to challenge any or all of the findings of fact and no further record is developed as to those findings, the administrative findings of fact become the "facts" for purposes of the circuit court's review, as well as our own. *See Lee v. Appraiser Certification and Licensure Board,* 160 Or App 622, 624, 981 P2d 825 (1999) (unchallenged administrative findings are binding on judicial review).

Pursuant to formally promulgated policies, the district permits "responsible school and nonschool organizations, associations, and individuals" to have access to school grounds and facilities during and after school hours under specified conditions.[7] The district does so recognizing that schools and facilities are tax supported and that access for community groups enriches the education and the welfare of the students and enhances community life generally.[8] The groups that the district's policies specifically anticipate will use school facilities at various times for various purposes include (1) school organizations (such as school clubs and parent-teacher organizations); (2) principal-approved nonschool organizations for students under the age of 21 (such as Boy Scouts, Girl Scouts, Campfire Girls, YMCA Clubs, and 4-H Clubs); and (3) nonprofit clubs or groups organized for education, recreation, health, culture, civic betterment, community enrichment, or neighborhood services.[9] District policies pertaining to community access primarily address activities that are prohibited or restricted. For example, on-premises solicitation of students for gifts and things of value is constrained, as is activity involving the sale of merchandise by nonstudents.[10] Of significance to this case, district policy prohibits in absolute terms the "distribution in any manner of

---

[7] District Policy 3.30.020 provides, in part:

"LIMITATION ON USE OF FACILITIES AND GROUNDS—ALL GROUPS OR INDIVIDUALS. The special requirements of the educational setting, school programs, and the welfare and safety of personnel compel judicious utilization of school facilities and school grounds, especially during school hours. Accordingly, special policies and regulations, as outlined below, shall obtain for the use of school buildings and grounds. However, since the school buildings and grounds of the District have been established, maintained, and are operated by funds largely provided by local taxes, the Board of Education intends that these facilities shall be used to the extent possible for the enrichment of the life of the community. School buildings shall be available to responsible school and nonschool organizations, associations, and individuals of the community within requirements of the District's programs of education and with consideration for the general welfare of the students and the School District, as outlined below."

The district's policies frequently refer to the statewide policies that evidently have been promulgated by the Oregon State Board of Education. None of the parties, however, has cited or relied on the board's policies. We therefore have not examined them.

[8] *See* District Policy 3.30.020.

[9] *See generally* District Policy 3.30.010 (pertaining to charges and waiver of charges for use of and access to school facilities).

[10] *See generally* District Policy 3.30.020 (1) - (13).

any book, testament, pamphlet, tract or other printed matter of any religious character whatsoever on the school premises during the school day by nonstudents."[11]

The Boy Scouts is among the community organizations that have availed themselves of the district's school-access policy. The Boy Scouts of America is a national organization with a goal of making scouting available to all youths who meet its membership requirements. To that end, the local Boy Scouts makes a concerted effort to reach out to youth who are underserved by scouting programs, particularly disadvantaged youth and minority communities. That effort involves, among other efforts, identifying elementary schools in the district for outreach activities and attention. Once the outreach program appears to be succeeding in a particular school, the outreach activities at that school are discontinued.

In a typical elementary school visit, a Boy Scouts representative arranges with the school's principal for a convenient time during the day to make a presentation to the students; usually, the presentation is made in the lunchroom. The representative makes the presentation in less than five minutes, inviting interested boys and their parents to attend an upcoming "Scout Night" to learn more about scouting and, if they choose, to join the Boy Scouts. The representative brings literature for distribution. Boys who want the literature may take it home to share with their parents. Although the representative extends an invitation to an orientation meeting, he does not engage in any direct recruiting. Neither does the representative deliver a religious message of any sort or distribute any literature referring to or mentioning religion.

The Boy Scouts' activities at Harvey Scott Elementary School, when plaintiff's son was a student there, were consistent with a typical Boy Scouts school presentation. In 1996, when plaintiff's son was in the first grade, the Boy Scouts engaged in outreach activities in an effort to encourage boys at the school to get involved in scouting. The first such outreach activity occurred in September of that year,

---

[11] District Policy 3.30.020 (11)(c).

when the Boy Scouts provided one-page flyers to school staff for distribution to students.

Plaintiff's son received one of the flyers from his teacher. The flyers consisted primarily of illustrations of boys involved in recreational activities (*e.g.*, playing sports, planting trees, camping, birdwatching, practicing archery, flying kites, and making crafts). In large lettering, they stated "Get in on the Fun" and "You can join now!" In smaller lettering, they read "Tiger Cubs for First Graders," "Cub Scouts for 2nd & 3rd Graders," and "Webelos for 4th & 5th Graders."[12]

The next month, two Boy Scouts representatives obtained permission from the Harvey Scott Elementary School principal to provide information to students during the lunch hour about joining Cub Scouts. A school staff member supervising the students in the cafeteria introduced the representatives, after which the representatives spoke briefly. They announced that they were there to provide information about a Boy Scouts membership meeting and that interested boys could raise their hands to receive that information. The representatives described the general kinds of activities involved in scouting but did not touch on anything having to do with religious beliefs or religious activities. The representatives did not hand out any flyers at that time. Rather, the only information they distributed was in the form of wristbands that read:

> "COME JOIN CUB SCOUT PACK 16! ROUND-UP FOR NEW CUB SCOUTS FOR BOYS IN GRADES 1-5[.] <u>TODAY from 7-8 pm (10-15-96)</u>[.] Scott Elementary School[.] Questions? Call Chrissy Smith @ * * *."

(Underscoring in original.) The informational wristbands were provided to students who expressed an interest in receiving them and were to be worn home by students so that their parents would receive the information about the meeting time and place. The school staff member supervising the students provided limited assistance by putting wristbands

---

[12] Also in September 1996, Boy Scouts representatives were allowed to set up an information table at the school during a parents' night open house. Plaintiff does not focus on activities involving parents nor appear to challenge or seek to enjoin that aspect of the Boy Scouts' access.

on interested boys at the table near where she was standing.[13] Although not all boys wanted information about the meeting, many did. Plaintiff's son was among those who did, and he obtained a wristband.

The next year, in September 1997, a Boy Scouts representative made a similar visit during a school lunch hour to encourage boys to consider joining. The record does not reflect that plaintiff's son was in the lunch room on that occasion. The announcement was similar to the one made the year before. It was brief and was limited to giving students general information about scouting and telling them that any boy interested could have a wristband with information about the membership meeting. The only notable difference from the prior year's presentation was that wristbands were not placed on students' wrists during the presentation. Instead, the students were told that the Boy Scouts representative would be outside the cafeteria and that interested students could approach him to obtain a wristband.

Plaintiff complained to district officials about the policy of permitting the Boy Scouts access to schools and students when, after investigating the organization further, plaintiff determined that her son could not join because he was an atheist. To join, a boy must take the Scout Oath and agree to obey Scout Law. Through the Scout Oath, a boy pledges to honor his duty to God and his duty to his country, to help others, and to obey Scout Law. The Scout Law to which a scout must subscribe is to be "trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent." Because the Scout Oath and general scouting principles require a belief in God, persons who do not have that belief, such as atheists, are not eligible for membership. Although a belief in God is necessary for membership, the organization is otherwise nondenominational.[14]

---

[13] The record reflects that the school staff member did this on her own initiative to help the boys sitting near her, because the wristbands cannot be attached without someone else's assistance. She did not do it because she was asked by the Boy Scouts representatives to help or because school policy required (or even expressly allowed) her assistance.

[14] The requirement that members have a belief in God is consistent with, but not expressly mandated by, the Bylaws of the Boy Scouts of America, which contains a Declaration of Religious Principle that states, in part, "[R]ecognition of God as the ruling and leading power in the universe and the grateful acknowledgment of His favors and blessings is necessary to the best type of citizenship * * *."

The Boy Scouts of America is a nonprofit charitable organization chartered by Congress in 1916 "to promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using methods that were in common use by boy scouts on June 15, 1916." 36 USC § 30902 (2001). The Boy Scouts strives to instill in its members the values contained in the Scout Oath and Scout Law, including patriotism, courage, and self-reliance. The stated purposes of cub scouting, as identified for parents in the Cub Scout handbook, include:

- positively influencing character development and encouraging spiritual growth

- helping boys develop habits and attitudes of good citizenship

- encouraging good sportsmanship and pride in growing strong in mind and body

- improving understanding within the family

- strengthening their ability to get along with other boys and to respect other people

- fostering a sense of personal achievement by helping boys develop new interests and skills

- showing how to be helpful and do one's best[15]

The Boy Scouts does not provide any sectarian instruction. Rather, it encourages the scouts' personal spiritual growth by inviting them to explore their religious values with their parents and through any church, synagogue, or religious fellowship to which they belong. Any such exploration is voluntary.[16]

---

[15] *Wolf Cub Scout Book*, published by Boy Scouts of America at 4-5 of the Parent Guide section (1998 printing).

[16] Through the Religious Emblems Program, a scout can explore his religious values through his parents and the family's church, religious organization, or religious fellowship to earn an emblem (badge) symbolizing his religion for his uniform. The program is voluntary. Fifteen different emblems are illustrated in the Cub Scout handbook, including emblems for Buddhist, Jewish, Meher Baba, Islamic, Protestant, Baha'i, Eastern Orthodox, Hindu, Roman Catholic, and Quaker faiths. *Wolf Cub Scout Book* at 95.

## II. STANDING AND MOOTNESS

 To meet constitutional justiciability requirements, a plaintiff invoking a court's jurisdiction to resolve a controversy must demonstrate that the interests of the parties litigant are adverse and that a decision by the court will have a practical effect on the plaintiff's rights. *Utsey v. Coos County*, 176 Or App 524, 540, 32 P3d 933 (2001), *rev allowed*, 334 Or 75 (2002). The requirement that the court's decision have a practical effect on the party invoking the court's jurisdiction must remain satisfied throughout the litigation. *Id.* If the court's decision will not have a practical effect on the plaintiff because the plaintiff cannot demonstrate an injury or other impact on a legally recognized interest, the case will be dismissed based on the plaintiff's lack of standing. *Poddar v. Clatsop County*, 167 Or App 170, 2 P3d 928, *adhered to on recons*, 168 Or App 556, 7 P3d 677, *rev den*, 331 Or 193 (2000). Relatedly, "[c]ases that are otherwise justiciable, but in which a court's decision no longer will have a practical effect on or concerning the rights of the parties, will be dismissed as moot." *Brumnett v. PSRB*, 315 Or 402, 406, 848 P2d 1194 (1993). Those standing requirements apply with equal force in administrative proceedings brought to the courts for judicial review as in other actions, such as declaratory judgment actions brought pursuant to ORS chapter 28. *Utsey*, 176 Or App at 546-47.

In her complaint challenging the superintendent's order and seeking declaratory and injunctive civil relief against the district, plaintiff pleaded her status as a resident and taxpayer in Multnomah County and in the State of Oregon. Plaintiff further pleaded that she was at all times the mother of Remington Powell, who was then a seven-year-old minor and a student at Harvey Scott Elementary School,[17] and that the district's policy of permitting the Boy Scouts to have access to district schools is "an impermissible

---

[17] In the circuit court, the district challenged plaintiff's standing to bring her claim for declaratory and injunctive relief, asserting that plaintiff's status as a state and local taxpayer was an insufficient interest to support her claim. The district disregarded plaintiff's allegations that she was the mother of a child attending a school in which the Boy Scouts engage in membership activities. On appeal, the district renews its taxpayer standing challenge, continuing to disregard plaintiff's allegations that she is the mother of a student in a district school.

expenditure of taxpayer monies by a public entity" under Article I, sections 2, 3, and 5, of the Oregon Constitution. As part of her allegations challenging the superintendent's order, plaintiff specifically asserted that the district, by permitting the Boy Scouts to have access to district schools, "sponsors, financially supports or is actively involved with religious activities." As part of her allegations seeking declaratory and injunctive relief, plaintiff asserted that the district, if not enjoined, will continue to spend taxpayer monies and resources in violation of the Oregon Constitution to the "irreparable injury of all Multnomah County taxpayers." Finally, in both her petition for review and her claims for civil relief, plaintiff sought attorney fees based on, *inter alia*, her assertion that she was acting as a "private attorney general to vindicate the public's interest[.]"

If plaintiff continued to be the mother of a student at a school in which the Boy Scouts takes advantage of the district's policy of community access, issues of standing and mootness would not detain us. Parents have a well-recognized and, in fact, federally protected interest in directing and controlling the religious training of their children. *See Wisconsin v. Yoder*, 406 US 205, 213-14, 92 S Ct 1526, 32 L Ed 2d 15 (1992). As a consequence, the fact that school children are subjected to unwelcome religious exercises or forced to assume special burdens to avoid them readily establishes an interest sufficient to give parents standing to raise challenges to school activities and policies on establishment of religion grounds. *See, e.g., Abington School Dist. v. Schempp*, 374 US 203, 225 n 9, 83 S Ct 1560, 10 L Ed 2d 844 (1963); *accord Valley Forge College v. Americans United*, 454 US 464, 487, n 22, 102 S Ct 752, 70 L Ed 2d 700 (1982).

The problem here, however, is that plaintiff's status has changed. In response to our inquiry, the parties have advised us that, in September 2001, plaintiff transferred her son to another school in the district, one in which the Boy Scouts has not engaged in membership activities.[18] Because

---

[18] Oral argument in this case occurred after the transfer, but no party brought that change of circumstance to our attention until we recently asked the parties about plaintiff's son's current school status. The superintendent and plaintiff contend that the case is not mooted by that fact. The district simply contends, without any analysis, that the case "may" be moot in light of that change of circumstance.

standing is a component of justiciability, which in turn is jurisdictional, we must begin with a determination of whether plaintiff's son's change of status moots her interests as a parent or whether her status as taxpayer is sufficient to give her standing in all events.

## A. *Standing to Seek Judicial Review of the Superintendent's Order*

Plaintiff's standing to seek review of the superintendent's order presents a somewhat different question than does her standing to bring a civil action against the district for declaratory and injunctive relief. The legislature, in enacting ORS 327.109, made an explicit policy choice to provide a process by which a complaint can be made to the superintendent alleging that a school district "sponsors, financially supports or is actively involved with religious activity." As we describe at greater length later in this opinion, *see* 185 Or App at 359-60, ORS 327.109 codifies federal principles prohibiting the government from establishing religion. The federal Establishment Clause is self-executing in the sense that a person with a sufficient interest may invoke a court's general jurisdiction through a declaratory or other civil action to enforce it. ORS 327.109, however, represents a deliberate legislative choice to provide for enforcement of the prohibition through a singular and specific means—*i.e.*, the withdrawal of state funding to school districts. In determining who could bring such a complaint to the superintendent, the legislature expressly declared that "a citizen of Oregon" may do so. ORS 327.109(1). The citizen may then seek judicial review of the superintendent's order, either as a person aggrieved by it, or as a party to a proceeding before the superintendent, if the superintendent holds a contested case hearing on the complaint. *See* ORS 327.109(2); ORS 183.482.

The question that logically follows is: Can the legislature constitutionally extend standing in this context to "any citizen of Oregon?" In our recent divided en banc decision in *Utsey*, a majority of the court held that the Oregon Constitution limits the legislature's ability to confer standing on persons to seek judicial review of executive or administrative action. More specifically, the majority held that, regardless of the legislature's provision of standing to obtain judicial

relief, constitutional requirements of justiciability require that (1) the interests of the parties to a judicial action be adverse, and (2) that a court's decision have some practical effect on the rights of the parties to the controversy. *Utsey,* 176 Or App at 540-50. The majority concluded that those requirements were not satisfied by the legislative scheme for judicial review of local land use decisions. Under that scheme, any person who participated in any local land use proceeding could seek judicial review of that decision. There were no legal limits on who could participate at the local level and no requirement that a participant, in seeking judicial review of the decision, demonstrate that the decision will have any legal effect on the person seeking review. *Id.* at 549-51. The majority concluded, therefore, that the statutes effectively conferred on litigants "the right to obtain an advisory opinion, which is beyond the authority of the legislature to grant" and that the petitioner in *Utsey* had not demonstrated any interest beyond a desire for such an advisory opinion. *Id.* at 550. As Judge Edmonds emphasized in a concurring opinion:

> "The vice of the statute is in its breadth—it has no mechanism, like the 'aggrievement' requirement of ORS 183.480(1), by which it limits the right of judicial review to those parties who have a personal stake in the outcome of the proceeding."

*Id.* at 561 (Edmonds, J., concurring).

Judicial review of the superintendent's order under ORS 327.109 differs from review of the land use decision in *Utsey* in two significant regards. First, here, because the superintendent declined to hold a hearing on plaintiff's complaint, plaintiff could seek judicial review of the superintendent's order in circuit court only as an "adversely affected or aggrieved" person within the meaning of ORS 183.480(1).[19]

---

[19] Although ORS 183.480(1) also provides that "any party to an agency proceeding is entitled to judicial review of a final order," that provision has no application here. After a preliminary investigation, the superintendent found no substantial support for plaintiff's complaint that the district was sponsoring, financially supporting, or actively involved with religious activity. As a result, no hearing was held. Plaintiff never became a party to a proceeding before the superintendent. *See* ORS 183.310(6) (defining "party" as used in ORS 183.310 to 183.550).

Second, under ORS 327.109, the legislature has expressly prescribed a qualification for a person filing a complaint with the superintendent—the person must be a citizen of Oregon. The record in this case differs from *Utsey* as well. In her complaint, plaintiff has alleged not only that she is a citizen but also that she is adversely affected or aggrieved by the district's policy in her capacity as a state and local taxpayer. Thus, the proper question here is not whether the legislature has somehow unconstitutionally enlarged the judicial power of this state by enacting ORS 327.109. Rather, the proper question is whether plaintiff has satisfied the statutory standard set out in ORS 183.480(1) and, if she has, whether her petition for review and complaint present the court with a constitutionally justiciable controversy.

█ In other contexts, neither citizen nor citizen-taxpayer status might be enough to demonstrate that a court's ruling will have an effect on a litigant's interests. In this particular context, however, it is. Establishment Clause principles are uniquely concerned with the use of government funds and resources. As a result, federal courts recognize that even generalized federal taxpayer standing, which ordinarily is not a sufficient interest to challenge governmental conduct on constitutional grounds, provides a sufficient injury-in-fact to a taxpayer such that a taxpayer may pursue an Establishment Clause-based challenge to an action that involves the appropriation of government funding.[20]

---

[20] *See Flast v. Cohen*, 392 US 83, 88 S Ct 1942, 20 L Ed 2d 947 (1968), *as limited by Valley Forge College*, 454 US at 479-80 (limiting the *Flast* taxpayer standing principle to establishment challenges to congressional spending and taxing authority); *see also Bowen v. Kendrick*, 487 US 589, 619-20, 108 S Ct 2562, 101 L Ed 2d 520 (1988) (extending exception for taxpayer standing in Establishment Clause cases to challenges to executive administration of legislative appropriation decisions); *Grand Rapids School District v. Ball*, 473 US 373, 380 n 5, 105 S Ct 3216, 87 L Ed 2d 267 (1985) (reaffirming principle that general state taxpayer status provides a sufficiently concrete interest to provide standing to bring Establishment Clause challenge), *overruled on other grounds by Agostini v. Felton*, 521 US 203, 117 S Ct 1997, 138 L Ed 2d 391 (1997).

It is worth noting, moreover, that municipal taxpayer status has long sufficed in most jurisdictions to challenge local expenditures on establishment of religion grounds. *See generally Doremus v. Board of Education*, 342 US 429, 433-34, 72 S Ct 394, 96 L Ed 475 (1952); *Massachusetts v. Mellon*, 262 US 447, 486, 43 S Ct 597, 67 L Ed 1078 (1923).

■ To be sure, the standing determinations of federal courts in Establishment Clause cases are not binding on us. Nevertheless, the logic underlying those determinations persuades us that, whatever the constitutional adequacy of generalized citizen or citizen-taxpayer status in other contexts, a citizen-taxpayer of Oregon has standing to seek judicial review of the superintendent's rejection of a complaint under ORS 327.109. Constitutional prohibitions on government establishment of religion are distinctly, and perhaps even uniquely, concerned with the use to which government puts its money and its resources. If anything, the Oregon Constitution expresses an even greater textual commitment to that concern than does its federal counterpart.[21] Were plaintiff's complaint to the superintendent ultimately determined to have merit, she would achieve two outcomes. First, she would prevent the use of state funds for a purpose specifically and expressly prohibited by the constitution. Second, state funding to the district would be cut off until the unconstitutional conduct stopped. Significantly, that state funding would revert to the State School Fund,[22] where it would then be used to benefit public schools elsewhere throughout the state. In that sense, a successful complaint to the superintendent not only furthers Establishment Clause values regarding the use of government money and resources, but it provides a tangible savings and recoupment of that money for the use of the public school system generally. We therefore conclude that, in this context, plaintiff's allegations of her interests as a citizen-taxpayer gave her standing to seek judicial review of the superintendent's order.[23] *See generally McIntire v. Forbes*, 322 Or 426, 432-33, 909 P2d 846 (1996).

---

[21] *Compare* Or Const, Art I, § 5 ("No money shall be drawn from the Treasury for the benefit of any religeous (*sic*), or theological institution * * *."), *with* US Const, Amend I ("Congress shall make no law respecting an establishment of religion * * *.").

[22] The withdrawn funds revert to the General Fund only if the biennium in which the funds were appropriated has ended. ORS 327.109(6)(b).

[23] The history of the statute's enactment reinforces our conclusion. The statute was enacted in response to activities in Wasco County School District 50J (also known as Rajneesh School District), where school children were extensively engaged in a Schools Without Walls program that required them to perform work directly for or for the benefit of Rajneesh religious organizations. The Attorney General advised the superintendent that, if the superintendent found a constitutional violation as a result of that activity, state funding to the district should be stopped. No explicit procedure for halting the funding or permitting the district a

### B. *Standing to Seek Declaratory and Injunctive Relief Against the District*

■ Our discussion of plaintiff's standing as a citizen-taxpayer for purposes of her complaint to the superintendent applies with equal force to her claim for declaratory and injunctive relief. Because Establishment Clause principles are uniquely concerned with the use of government money and resources, we hold that general citizen-taxpayer status provides a sufficiently concrete interest to satisfy constitutional justiciability requirements where the citizen-taxpayer seeks to stop the use of government money and resources to sponsor, financially support, or otherwise unconstitutionally aid religious activity. *See generally Bowen v. Kendrick*, 487 US 589, 619-20, 108 S Ct 2562, 101 L Ed 2d 520 (1988); *see also* 185 Or App at 351 n 21.

■ Plaintiff's status as the mother of a student in a school in the district also gives her standing to bring her claim for declaratory and injunctive relief. Granted, her son no longer attends a school in which the Boy Scouts engages in membership activities. But neither the district's policies nor the Boy Scouts' ability to pursue school membership activities pursuant to those policies at any school in the district have changed. The Boy Scouts' voluntary limitation of its activities, without more, does not render moot plaintiff's challenge to the district's policies. *See Tanner v. OHSU*, 157 Or App 502, 510, 971 P3d 435 (1998) ("The voluntary cessation of a practice that is challenged in an action for declaratory and injunctive relief does not, in itself, render an action moot[.]"). Moreover, as long as the district's policies remain in place, and as long as the Boy Scouts remains active in other schools within the district, plaintiff is confronted with a classic Hobson's choice: she must either subject her child to unwelcome and allegedly unconstitutional religious activity or she must restrict her choice of schools for her son to those

hearing on the matter existed, and the statute was enacted in response to that void. *See generally* Minutes and Exhibits, House Education Committee, HB 2568, May 3, 1985. In a circumstance—perceived or real—in which every student, parent, teacher, administrator, and taxpayer of a particular school district were to support the religious activities of a school, the legislature's grant of standing on a citizen-taxpayer basis would provide a crucial means of bringing the violation to the attention of state officials and the courts so that finite state school resources and funds would be spared from unconstitutional expenditure.

in which the Boy Scouts declines to recruit. If she does the latter, she must "assume the special burden to avoid" the interference with her right to raise her son free of religious interference with which she disagrees. *See Schempp*, 374 US at 224 n 9. Either choice provides her with a concrete stake in the litigation such that, if her claim has merit, a judicial resolution will have a practical effect on her rights and interests.

Finally, one additional interest gives plaintiff standing to pursue her claim for declaratory and injunctive relief, but it is an interest that depends on our conclusion that she has standing under ORS 327.109. If, as we have concluded, she has a sufficient interest to seek judicial review of the superintendent's resolution of her complaint under that statute, then, as the mother of a student attending a district school, she has a complementary interest in also seeking declaratory and injunctive relief. That is so because her complaint, if well founded, would result in a withdrawal of state funding to the district as a whole—not just to Harvey Scott Elementary School—unless and until the district's policy is changed to prevent the allegedly offensive Boy Scouts' membership activities. ORS 327.109(6)(b) - (c). Such a withdrawal of funding would have an obvious detrimental effect on the education of every public school student in the district, including plaintiff's son, regardless of the district school the student attends and regardless of the Boy Scouts' voluntary restraint of its activities in some schools. Although the statute provides for funding to be reinstated as soon as the offending conduct ceases, it provides no mechanism by which the superintendent may force a district to cease that conduct. *See* ORS 327.109(6). Thus, plaintiff's claim for declaratory and injunctive relief would serve the salutary purpose of ensuring that the allegedly unconstitutional activities were halted as soon as they were judicially declared to be unconstitutional, which would ensure that state funds were not withdrawn from the district, which in turn would ensure that funding for every school child in the district (including plaintiff's son) was not dramatically decreased. That interest, too, is adequate to support plaintiff's standing to bring her civil action against the district. *See McIntire*, 322 Or at 433 (local taxpayer status provided standing to challenge a measure that would have the effect of diverting state funds from local

uses to uses elsewhere in the state). Because we conclude that plaintiff has standing to pursue both judicial review of the superintendent's order and her civil claim against the district, and because a judicial decree will have a practical effect on plaintiff's interests notwithstanding her son's transfer to another district school, we turn to the merits.

## III. THE APPLICABLE LEGAL ANALYSIS

Ordinarily, we would begin with plaintiff's statutory claim and proceed to her constitutional challenge, if at all, only after resolving that statutory claim. *See generally Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 564, 687 P2d 785 (1984) (describing first-things-first methodology). In this instance, we begin with the state constitutional analysis for two reasons. First, we must reach the constitutional analysis in all events, because plaintiff's claims for declaratory and injunctive relief are distinct and severable from her challenge to the superintendent's order under ORS 327.109. If plaintiff were to prevail under the statute, the only remedy would be a withdrawal of state funds from the district; plaintiff would not necessarily obtain the further relief that she seeks, which is an injunction preventing the district from permitting the Boy Scouts to present membership information to elementary schools students during school hours.[24] As to plaintiff's claim for an injunctive remedy, no statute is implicated, and plaintiff's ground for seeking that remedy is constitutional only.

Our second reason for starting with the constitutional analysis is that, as the parties agree and we later describe, the statute on which plaintiff relies is a codification of the constitutional principle. Consequently, the analysis that applies under that statute is substantially the same as the constitutional analysis. *See State v. Toevs*, 327 Or 525, 534, 964 P2d 1007 (1998) (where the legislature intended to codify case law interpreting constitutional provisions, the statutory analysis is not independent of the constitutional one). Recognizing that fact, the parties' arguments are

---

[24] To be sure, a withdrawal of state funds from the district almost certainly would result in the district's exclusion of the Boy Scouts from its access policy in order to restore funding. That would be a practical consequence of successful litigation, however, not relief to which plaintiff would be entitled as a matter of right.

largely devoted to an analysis of whether the district's policies and practices, as pertinent to the Boy Scouts' membership activities at elementary schools, violate the Oregon Constitution. We agree with that focus and begin there.

## A. *The Constitutional Analysis*

■ ■ Plaintiff's claim against the district is premised on the theory that, by permitting the Boy Scouts to distribute membership information on school grounds, the district violates the Oregon Constitution's prohibition on governmental establishment of religion.[25] With regard to that constitutional challenge, the focal point for the parties' debate is the legal analysis that correctly applies. Plaintiff, relying on the analytical methodology of *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992), urges us to take a fresh look at the meaning of the Oregon Constitution's potentially relevant clauses by analyzing their text, the historical circumstances that led to their creation, and the case law surrounding them. Plaintiff then offers us an extensive analysis under the *Priest* factors that leads, in plaintiff's view, to a particularly strict principle of separation of church and state, one that plaintiff urges would invalidate the district's policy as it extends to the Boy Scouts' activities in this case. Defendants, on the other hand, argue that the law is settled and that the test in place erects no such strict separation principle. The trial court agreed with defendants, as do we.

More than 25 years ago, in *Eugene Sand & Gravel v. City of Eugene*, 276 Or 1007, 558 P2d 338 (1976), *cert den*, 434

---

[25] At trial, plaintiff moved to amend her complaint to add her son as a plaintiff and also to add a claim that the district's practices violated her and her son's free exercise rights. Plaintiff on appeal assigns error to the denial of that motion, arguing that the trial court abused its discretion by not permitting her to add her son as a party in response to the district's challenge to her standing. That is not an issue we need to reach, given our resolution of the standing and mootness issues. We do not understand plaintiff to renew her argument on appeal that she should have been permitted to amend her complaint to add an entirely new constitutional claim. Even if plaintiff's argument encompasses that point, however, we reject it without further discussion. *See Edwards v. Lewis*, 76 Or App 94, 96, 98, 707 P2d 1298 (1985), *rev den*, 300 Or 477 (1986) (not error to deny motion to amend complaint that would add additional claim at summary judgment stage of proceedings); *see also Mobley v. Manheim Services Corp.*, 133 Or App 89, 95-96, 889 P2d 1342, *rev den*, 321 Or 47 (1995) (similar); *Humbert Excavating, Inc. v. City of Pendleton*, 118 Or App 137, 143, 846 P2d 441, *adh'd to as modified on recons*, 120 Or App 431, 852 P2d 932 (1993) (similar).

US 876 (1977), the Oregon Supreme Court held that the appropriate test for deciding an establishment-like challenge brought under the Oregon Constitution is the so-called *Lemon* test,[26] which evolved out of United States Supreme Court jurisprudence:

> "The test established by the Supreme Court of the United States for application in determining whether a law is constitutional under the First Amendment Establishment Clause is as follows: (1) the law must reflect a clearly secular legislative purpose; (2) it must have a primary effect that neither advances nor inhibits religion (as distinguished from an incidental effect); and (3) it must avoid excessive government entanglement with religion. *We hold that this same test is also appropriate for application in determining whether a law is constitutional under similar provisions of the Oregon Constitution.*"

*Id.* at 1012-13 (footnotes and internal quotation marks omitted; emphasis added). *See id.* at 1016 ("The only proper basis for deciding the validity of [laws allegedly establishing religion] is whether they satisfy the three-fold test of 'purpose,' 'primary effect' and 'entanglement.' "). As that passage emphasizes, the court did not limit application of the three-part test to a single provision or clause of the Oregon Constitution. Rather, the court held the federal test to be proper for resolving any establishment claim pursued under the several clauses directed to the relationship of government and religion—namely, Article I, section 2 (securing freedom of worship), Article I, section 3 (preserving rights of free exercise of religion and rights of conscience), and Article I, section 5 (prohibiting state expenditures of money for the benefit of religious institutions). *Id.* at 1016 n 6 (quoting in full those sections of the Oregon Constitution).[27]

---

[26] The court cited *Committee for Public Education v. Nyquist*, 413 US 756, 773, 93 S Ct 2955, 37 L Ed 2d 948 (1973), *Lemon v. Kurtzman*, 403 US 602, 612-13, 91 S Ct 2105, 29 L Ed 2d 745 (1971), and *Schempp*, 374 US at 222, as the sources for the federal test it adopted. *See Eugene Sand & Gravel*, 276 Or at 1016 n 5. Since then, the test has come to be most closely associated with *Lemon v. Kurtzman* and is commonly referred to as the *"Lemon"* test.

[27] Plaintiff grounds her argument on appeal in Article I, sections 2 and 3, as well as in Article I, section 5. Defendants urge that her reliance on sections 2 and 3 is unpreserved and that, in all events, she makes only an establishment argument, which correctly arises only under Article I, section 5. That disagreement between the parties does not matter to the analysis. Perhaps recognizing that the Oregon

Plaintiff correctly points out that, in the years since the court decided *Eugene Sand & Gravel,* the Oregon Supreme Court has adopted an independent approach to state constitutional analysis, often invoking the interpretative methodology outlined in *Priest* as the framework for independently examining the meaning of the original provisions of the Oregon Constitution. *See, e.g., Smothers v. Gresham Transfer, Inc.,* 332 Or 83, 90-91, 23 P3d 333 (2001). The Supreme Court also has expressed its willingness to reexamine its holdings in prior cases when the analysis in those cases failed to use the *Priest* interpretative methodology. *See, e.g., Stranahan v. Fred Meyer, Inc.,* 331 Or 38, 56, 11 P3d 228 (2000). But the fact that the Supreme Court is free to revisit its own precedents on that basis does not mean that we may do so. As plaintiff recognizes, the Supreme Court has never overruled *Eugene Sand & Gravel.* Because it has not done so, that case remains binding on this court.

We therefore reject plaintiff's invitation to disregard the holding in *Eugene Sand & Gravel.* In doing so, it is worth observing that, in addition to adopting the *Lemon* three-part test, the court in *Eugene Sand & Gravel* endorsed a fundamental understanding of the constitutional value that the test is designed to serve. Contrary to plaintiff's position, the Oregon Constitution does not embrace an unusually strict principle of separation of church and state. Rather, Oregon's religion clauses were intended to ensure that the state does not cross the line between neutrality toward religion and support of religion. *Eugene Sand & Gravel,* 276 Or at 1013. Identifying that line is a problem of degree, one that does not lend itself to bright demarcations. *See id.* As the court emphasized in *Eugene Sand & Gravel,*

" 'there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.' "

---

Constitution contains no explicit creedal preference or Establishment Clause parallel to that in the federal constitution, the court in *Eugene Sand & Gravel* held the *Lemon* test to apply based on the *nature* of the claim asserted, not the particular clause cited as a source the claim. 276 Or at 1012-13, 1016 n 6. Here, despite plaintiff's attempt to expand the constitutional sources of her claim, the substance of that claim remains the same—that is, her claim is that permitting the Boy Scouts to enter school grounds to encourage membership in their organization constitutes governmental establishment of religion.

*Id.* at 1014 (quoting *Walz v. Tax Commission,* 397 US 664, 669, 90 S Ct 1409, 25 L Ed 2d 697 (1970)). In applying the *Lemon* three-part test to the facts presented, therefore, we do so cognizant of the underlying constitutional value to be served.

## B. *The Statutory Analysis*

■ As earlier described, plaintiff's complaint to the superintendent was based on an alleged violation of statutory standards rather than on the Oregon Constitution. In particular, plaintiff proceeded under ORS 327.109, which permits a citizen to complain to the superintendent that a school district is one "that sponsors, financially supports or is actively involved with religious activity[.]" Following a preliminary investigation, the superintendent issued an order determining that there was no substantial basis to believe that the district had violated the statute. In doing so, the superintendent concluded that the statute codifies constitutional principles and that it was therefore appropriate to apply the three-part test adopted in *Eugene Sand & Gravel.* We agree.

Our analysis of the statute's meaning in this case begins and ends with text. *See PGE v. Bureau of Labor and Industries,* 317 Or 606, 610, 859 P2d 1143 (1993). The terms chosen by the legislature—"sponsors, financially supports or is actively involved with religious activity"—have well-recognized legal significance. *See Brian v. Oregon Government Ethics Commission,* 320 Or 676, 683, 891 P2d 649 (1995) (statutory words with a well-understood legal meaning are given that meaning); *Gaston v. Parsons,* 318 Or 247, 253, 864 P2d 1319 (1994) (same).[28] The terms and their

---

[28] On appeal, the superintendent begins the analysis by examining whether the terms are exact, inexact, or delegative in nature. *See Coast Security Mortgage Corp. v. Real Estate Agency,* 331 Or 348, 353, 15 P3d 29 (2000) (citing *Springfield Education Assn. v. School Dist.,* 290 Or 217, 223, 621 P2d 547 (1980)). That inquiry is inapplicable here, however, because the superintendent has no statutorily assigned role in interpreting or promulgating rules for the enforcement of ORS 327.109. That is the province of the Board of Education. ORS 327.125. The board has not found it necessary to adopt any rules in that regard. Thus, the superintendent, in attempting to determine the statute's meaning and apply it, is in a position identical to that of a court interpreting the statute.

phrasing are taken directly from the United States Supreme Court's Establishment Clause jurisprudence:

> "[F]or the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity."

*Walz*, 397 US at 668. After first making that observation in *Walz*, the Court repeated its observation in the cases relied on in *Eugene Sand & Gravel*, such as *Lemon v. Kurtzman*, 403 US 602, 612-13, 91 S Ct 2105, 29 L Ed 2d 745 (1971), and *Committee for Public Education v. Nyquist*, 413 US 756, 772, 93 S Ct 2955, 37 L Ed 2d 948 (1973), as well as a host of others decided before the legislature enacted ORS 327.109. *See* Or Laws 1985, ch 584, § 2.[29] The Court's three-part test was designed, in the absence of precisely stated constitutional prohibitions, to draw lines with reference to "the three main evils against which the Establishment Clause was intended to afford protection: 'sponsorship, financial support, and active involvement of the sovereign in religious activity.' " *Lemon*, 403 US at 612-13 (quoting *Walz*, 397 US at 668).

Because the legislature's intention to codify federal Establishment Clause principles is evident, the analysis under the statute should be substantially the same as that under the constitutional provision. *Toevs*, 327 Or at 534. Therefore, the three-part *Lemon* test adopted by the court in *Eugene Sand & Gravel* appropriately applies to plaintiff's complaint under ORS 327.109.[30]

---

[29] The statute was enacted in 1985. *See* Or Laws 1985, ch 584, § 2. In addition to *Lemon* and *Nyquist*, other cases decided by then that repeated the key phrasing include *Grand Rapids School District v. Ball*, 473 US 373, 381, 105 S Ct 3216, 87 L Ed 2d 267 (1985); *Trans World Airlines, Inc. v. Hardison*, 432 US 63, 90-91 n 4, 97 S Ct 2264, 53 L Ed 2d 113 (1977); *Meek v. Pittenger*, 421 US 349, 359, 95 S Ct 1753, 44 L Ed 2d 217 (1975); *Wisconsin v. Yoder*, 406 US 205, 234-35 n 22, 92 S Ct 1526, 32 L Ed 2d 15 (1972); and *Tilton v. Richardson*, 403 US 672, 677, 91 S Ct 2091, 29 L Ed 2d 790 (1971).

[30] Plaintiff, we note, does not really argue to the contrary. She agrees that the statute was intended to embody the then-prevailing state and federal constitutional standards for an Establishment Clause violation. She reasons, however, that because the Oregon constitutional analysis should be changed in light of the interpretative methodology in *Priest*, the statute's meaning should follow that change. We need not further consider plaintiff's argument in that regard, given our determination that *Eugene Sand & Gravel* remains binding.

## IV. APPLICATION OF THE LEGAL ANALYSIS
## TO THIS CASE

The *Lemon* test requires us to ask three questions with regard to the district's policy of permitting the Boy Scouts to provide membership information to elementary students on school grounds: (1) Does the district's policy reflect a secular purpose? (2) Is the primary effect of that policy to advance or inhibit religion? (3) Does the administration of the policy excessively entangle the district in religion? To sustain the district's policy and practices, we must answer all three questions in the district's favor. In addressing the three prongs of the inquiry, we appropriately consider the broader framework of law that has developed around the federal analysis. *Eugene Sand & Gravel*, 274 Or at 1019 (court may look to decisions of other jurisdictions applying the *Lemon* analysis to similar facts and circumstances, which are not controlling but can be considered for their persuasive value).

■ The district's purpose is expressly identified in its policy: to provide community groups with access to the schools that they support, for the enrichment of both the students and the community generally. The policy is a neutral one that permits access to the district's schools on the basis of neutral criteria. The Boy Scouts is but one of many groups that can avail themselves of the opportunity to distribute information about their activities to students. Other groups do the same. Plaintiff does not argue that enriching the life of the students and the community in general is anything other than a manifestly secular purpose. Nor does plaintiff attempt to impeach the district's good faith in adopting the policy. We conclude that the district's policy of permitting community access to and use of its public schools readily satisfies the secular purpose inquiry.

■ The next question is whether the "primary effect" of the district's policy or practice is to advance religion. As the Supreme Court has cautioned, "the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation has consistently been rejected." *Hunt v. McNair*, 413 US 734, 742, 93 S Ct 2868, 37 L Ed 2d 923 (1972). The crucial question is not whether a government policy provides some aid or benefit to religion. Rather, to be unconstitutional, the policy

must have a primary effect of *advancing* religion. *Tilton v. Richardson*, 403 US 672, 679, 91 S Ct 2091, 29 L Ed 2d 790 (1971) (plurality opinion). *See Dickman et al v. School Dist. No. 62C et al*, 232 Or 238, 246, 366 P2d 533 (1961), *cert den*, 371 US 823 (1962) (The principle of separation of church and state has not been applied in such a strict form as to prohibit the government "from conferring *any* benefit upon religious institutions * * *, no matter how indirect it might be." (Emphasis in original.)). Whether there is such a primary effect is largely dictated by the nature of the governmental benefit and the nature of the organization benefitted:

> "Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting."

*Hunt*, 413 US at 743.

In this case, we are satisfied that the district's policy of community access to its schools, as that policy is implemented for the Boy Scouts, has a primarily secular effect and does not advance religion. Two factors in particular lead to that conclusion. The first is the nature of the Boy Scouts' activities in the schools, as developed in the record before us. A Boy Scouts representative addresses the students for a limited purpose: to make the organization's existence known and to tell students (and their parents, via the students) how to learn more about the organization and join it. That is all. No religious message is conveyed; religion is not so much as mentioned. The students' exposure to that limited message is brief, consisting of a five-minute announcement in the school cafeteria. Also, the students voluntarily may receive printed information (*i.e.*, a flyer or a wristband) with meeting-place information to take home to their parents. That limited information is given to students once or, at most, twice in a full school year. Such brief, neutral activity that conveys no religious message cannot sensibly be equated with governmental advancement of religious beliefs or principles.[31]

___

[31] Indeed, according to the record in this case, neither school officials, nor teachers, nor parents understood from their general perceptions of the Boy Scouts or the organization's school activities that the Boy Scouts had any religious component whatsoever. They became aware of that fact only after plaintiff investigated

■ That conclusion is reinforced by a second consideration: the neutrality and general applicability of the district's policy. The district's policy is not a special one for the Boy Scouts but, rather, is an evenhanded policy of access extended to a broad spectrum of community groups on neutral terms—that is, on terms that have nothing to do with religion. As the Supreme Court has observed, the provision of a benefit on a neutral basis to religious and nonreligious groups alike "is an important index of secular effect" and confers no "imprimatur" of government endorsement of religion. *Widmar v. Vincent*, 454 US 263, 274, 102 S Ct 269, 70 L Ed 2d 440 (1981). *See Westside Community Bd. of Ed. v. Mergens*, 496 US 226, 252, 110 S Ct 2356, 110 L Ed 2d 191 (1990) (plurality opinion). In other words, in such a circumstance, what the government sponsors—and is likely to be perceived as sponsoring—is a neutral policy of access, not a religious organization or particular religious beliefs. Alone and in combination, the limited nature of the Boy Scouts' activities and the neutral and generally applicable nature of the district's policy defeat plaintiff's argument that the district's policy, insofar as it permits access by the Boy Scouts, has a primary effect of advancing religion.

■ In arguing to the contrary, plaintiff repeatedly characterizes the Boy Scouts as "a religious organization" based on its requirement that a boy, to join the organization, must believe in God and take an oath to do his duty to God. Plaintiff's principal position is that, by permitting the Boy Scouts to distribute information about its membership meetings, more boys who believe in God are encouraged to join the organization, which necessarily results in advancing religion.

Plaintiff's argument, however, suffers from two flaws, one legal and one factual. As for the legal flaw, the fact that the district's access policy may benefit the Boy Scouts by increasing the number of boys that join the organization is, no doubt, a benefit to the organization. But such aid is not, for constitutional purposes, the equivalent of advancing religion, even in the case of a pervasively religious organization. As the Supreme Court has observed in cases involving religious

---

the Boy Scouts' membership policies for atheists and, later, formally complained to district officials.

schools, even financial aid channeled only to the secular functions of a religious institution may serve

> "indirectly and incidentally to promote the religious function by *rendering it more likely that children [will] attend* sectarian schools and by freeing the budgets of those schools for use in other nonsecular areas. But an indirect and incidental effect beneficial to religious institutions has never been thought a sufficient defect to warrant the invalidation of [such aid]."

*Nyquist*, 413 US at 775 (emphasis added). Plaintiff's argument here is analogous. She reasons that the religious function of the Boy Scouts will be promoted because the Boy Scouts' activities on school property render it likely that more boys will join. But as in cases involving aid to religious schools that may ensure continued or increased enrollments, any enhancement to the religious function of the organization is indirect and incidental and therefore is not constitutionally objectionable.

 The factual flaw in plaintiff's argument is in her characterization of the nature of the Boy Scouts as an organization. Plaintiff approaches the religious character of any group or organization as though it is an all-or-nothing proposition. In plaintiff's view, because the Boy Scouts requires a belief in God as a criterion of membership and requires scouts to take an oath to do their duty to God, the Boy Scouts is a "religious organization" and any aid it receives because of a governmental policy *per se* results in the advancement of religion. Plaintiff's argument is misguided. Regardless of the label plaintiff chooses to use, "what matters is the substance of [an organization's] activities." *Good News Club v. Milford Central School*, 533 US 98, 112 n 4, 121 S Ct 2093, 150 L Ed 2d 151 (2001).[32]

---

[32] For her characterization of the Boy Scouts as a "religious organization," plaintiff also relies on the fact that, in prior litigation in other jurisdictions over speech and associational rights, the Boy Scouts has characterized itself as a religious organization. But such self-labeling, especially when it occurs in other litigation involving other constitutional interests, is not dispositive. This case calls on us to decide whether the district's policy of permitting the Boy Scouts' activities on school premises is unconstitutional based on what those activities are as established by our record and as analyzed under the three-part *Lemon* test. *See Eugene Sand & Gravel*, 276 Or at 1024 (prior determination that religious symbol violated establishment principles not binding; determination must be made at the present time based on the existing circumstances).

To be sure, there is a religious component to the Boy Scouts—that is, a scout must profess to believe in God and must take an oath to do his duty to God. In addition, a scout may choose to earn a religious emblem for his uniform by exploring his religious values. But a scout's religious beliefs—both their strength and their substance—are left to him and his family; any exploration of them is done individually and voluntarily. Beyond that, the record establishes that the bulk of Boy Scouts' activities is secular (*i.e.*, recreational and social). The record provides no basis for concluding that religious teaching or indoctrination is a substantial purpose or activity of the Boy Scouts, which is a fact that "reduces the risk that government aid will in fact serve to support religious activities." *Tilton*, 403 US at 687.

■ Finally, plaintiff emphasizes the impressionable nature of elementary school children, suggesting that they are more likely to be coerced into joining the Boy Scouts, and perhaps even to acquire a belief in God, due to the social pressures of the school environment. But the impressionability of the students is irrelevant to the analysis if the school is not engaging in conduct that advances religion. *Good News Club*, 533 US at 116. Here, the brief in-school presentations made by the Boy Scouts, together with the limited amount of information conveyed and the complete lack of any religious content, simply provide no basis to find that any *religious* impression is being made, irrespective of the impressionability of the students. As for plaintiff's concern with coercion, plaintiff's argument overlooks the role of the students' parents. The *parents* determine whether they and their son will attend a membership meeting and whether their son will then join the Boy Scouts. In other words, student participation in the Boy Scouts depends on parental consent. Thus, the relevant community to consider is that consisting of parents, not students. *See id.* at 115. Plaintiff's argument about the susceptibility of elementary school students to social pressure falls on that point as well.

■ We turn, then, to the final prong of the *Lemon* test, which is whether the district's community access policy leads to excessive entanglement of government with religion. Plaintiff makes only a cursory argument on that score,

asserting that entanglement results because school personnel hand out some materials and introduce speakers, and because presentations are made in school buildings. Plaintiff cites no cases in which such limited official involvement, which occurs for a few minutes once or twice in a school year, has been held to be excessive entanglement. Nor are we willing to so hold in this case.

The essential point of the "excessive government entanglement" prong of the three-part test is to ensure that, to maintain religious neutrality, government avoids creating "a kind of continuing day-to-day relationship" involving it in the activities of religious institutions or organizations. *Walz*, 397 US at 674. Policies that require "official and continuing surveillance" or that otherwise "encompass sustained and detailed administrative relationships for enforcement of statutory or administrative standards" give rise to classic entanglement problems. *Id.* at 675. On the record before us, the limited forms of assistance that school personnel give to the Boy Scouts, and presumably to other community groups who enter the premises to make similar presentations, hardly rise to that intensity of governmental involvement. Moreover, the fact that the presentations by the Boy Scouts are one- or two-time events in the course of a full school year means that there is no continuing day-to-day relationship between government and a religious organization of the kind that typifies the excessive entanglement concern. *See Tilton*, 403 US at 688. Finally, the fact that the Boy Scouts' access to school facilities is based on a neutral policy of general application tends, in and of itself, to defeat any entanglement argument. As aptly stated in a similar challenge in another jurisdiction, "[b]lanket regulations, which apply equally to religious and nonreligious groups alike, are simply not the type of government involvement that raises entanglement prong concerns." *Sherman v. Consol. School Dist. 21*, 8 F3d 1160, 1164 n 10 (7th Cir 1993). We agree.[33]

---

[33] We note, as other courts have, that a greater entanglement problem would likely be presented were plaintiff to prevail in this regard, for it would require the district to monitor the off-school-premises activities of all community service groups for any religious component. *See Rosenberger v. Univ. of Virginia*, 515 US 819, 844-45, 115 S Ct 2510, 132 L Ed 2d 700 (1995); *Widmar*, 454 US at 272 n 11.

## V. CONCLUSION

None of the prongs of the three-part test is satisfied in this case. Because they are not, plaintiff's constitutional claim against the district and her challenge to the superintendent's rejection of her statutory complaint fail. In reaching that conclusion, we have kept in mind the caution that the United States Supreme Court sounded in connection with the three-part *Lemon* test:

> "There are always risks in treating criteria discussed by the Court from time to time as 'tests' in any limiting sense of that term. Constitutional adjudication does not lend itself to the absolutes of the physical sciences or mathematics. The standards should rather be viewed as guidelines with which to identify instances in which the objectives of the Religion Clauses have been impaired."

*Tilton*, 403 US at 678. Therefore, in addition to applying the three-part test as *Eugene Sand & Gravel* requires, we have retained sight of the constitutional objectives that it serves. In that regard, this observation, made by the Oregon Supreme Court about the enduring principle reflected in religion clauses of the federal and state constitutions alike, is particularly apt:

> "It is to be expected that in the operation of the state residual benefits will accrue to the various religious groups, not because they are religious organizations but because they are, like other organizations, a part of the community which the state will, and must, serve indiscriminately. As Mr. Justice Black observed in * * * *Everson* [*v. Board of Education*, 330 US 1, 18, 67 S Ct 504, 91 L Ed 711 (1946)] * * *, the First Amendment (and its counterpart in state constitutions) 'requires the state to be neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions than it is to favor them.' "

*Dickman*, 232 Or at 255-56 (citation omitted). In this case, we are satisfied that the test, as we and the circuit court have applied it, has served the constitutional objective well.

Affirmed.