Argued and submitted December 10, 2002, reversed and remanded with instructions January 21, 2004

## JAL CONSTRUCTION, INC.,
a corporation,
*Respondent,*

*v.*

## Bill FRIEDMAN,
acting in his capacity as
Mayor of the City of Bend;
and Mike Elmore,
acting in his capacity as
the Public Works Director,
*Defendants,*

*and*

## CITY OF BEND,
a municipal corporation,
*Appellant.*

01CV0231ST; A117311

83 P3d 332

Jason Montgomery argued the cause for appellant. On the briefs were Robert E. Franz, Jr., and Law Office of Robert E. Franz, Jr.

Jeffrey B. Wilkinson argued the cause for respondent. With him on the brief were Matthew A. Wand and Stewart Sokol & Gray, LLC.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

LINDER, J.

**LINDER, J.**

This is an action under ORS 279.067 brought by JAL Construction (JAL), which was an unsuccessful bidder on a City of Bend (the city) public contract. On cross-motions for summary judgment, the trial court granted summary judgment in favor of JAL and awarded it damages. The sole issue on appeal is whether the city unlawfully awarded the contract to bidder Hap Taylor & Sons (HTS). That issue, in turn, depends on whether HTS substantially complied with all prescribed public bidding procedures and requirements. Contrary to the trial court's ruling, we conclude that HTS did substantially comply and that the city therefore lawfully awarded the contract to HTS as the lowest responsible bidder. We reverse and remand for entry of summary judgment in the city's favor.

The material facts are undisputed and arose out of the award of a public contract for a street improvement project in Bend. The city invited bids for a project entitled "Olney Avenue Realignment Phase III." In the written "invitation for bids," the city gave notice that sealed bids would be "accepted at the City of Bend Public Works Department Training Room by Bob Griffith, Purchasing Manager, 1375 NE Forbes Road, Bend, Oregon" until 11:00 a.m. on March 9, 2001.[1] The invitation for bids directed that bids be submitted under seal and marked with the title of the project. The invitation for bids also specified that the project was subject to ORS chapter 279, to the city's municipal code, and to the Attorney General's Model Public Contract Rules. Finally, the invitation for bids recited that the city "may reject any bid not in compliance with all prescribed procedures and requirements[.]"

Attached to the invitation for bids was, among other documents, a set of "Instructions to Bidders." The instructions identified grounds for rejection or disqualification of a bid. Specifically, the instructions told bidders that the failure to submit the required security with the bid "shall be cause

---

[1] The deadline for submission and opening of bids as stated on the original invitation was March 7, 2001, at 10:20 a.m., but Addendum #3, dated March 6, 2001, changed the date and time to those stated here.

for rejection" and that a failure to quote on all items as directed on the bid form "may disqualify the bid." The instructions also advised bidders that late bids—*i.e.*, ones not submitted before the time and date specified in the invitation for bids—would be "returned unopened." Finally, the instructions stated that bids could be withdrawn at any time before bid opening and that the city reserved the right to "reject any and all bids."

HTS submitted the bid that led to this dispute. HTS addressed its bid envelope to "City of Bend Public Works, Bob Griffith Purchasing MGR, 1375 NE Forbes Rd, Bend, Or[.]" An HTS representative took the bid to Bend City Hall, which is about 1.5 miles from the Public Works Building, where he spoke with Barbara Harriman, an administrative assistant. The HTS representative stated that he was not certain he was in the right place for delivery of bids. Harriman, noting that the bid was for the Olney Street Project, said that she would put the HTS bid in Griffith's mailbox at City Hall, which he checks daily. She then marked the date (March 9) and time (9:57 a.m.) on HTS's envelope, wrote her initials next to those markings, and immediately placed the bid in Griffith's mailbox. Griffith went to City Hall before the 11:00 a.m. deadline and picked up his mail, including HTS's unopened bid. He then took the envelope to his office at the Public Works Department, where it remained in his personal possession until the bids were publicly opened at 3:00 p.m.

A total of five contractors submitted bids on the project. The other four bidders—which included JAL—delivered their bids to the Public Works Department. None of them delivered their bids to Griffith personally or to the Training Room of the Public Works Department. Instead, they all gave the bids to one of two clerks. In each instance, the clerk initialed and stamped the outside of the envelope with the time and date of receipt.

Before opening the bids, Griffith disclosed the circumstances of his receipt of the HTS bid. JAL did not have a representative present, but one of the other bidders was there and objected to Griffith's acceptance of the HTS bid. Because Griffith believed that delivery of the bid to his City

Hall mailbox sufficed, he opened the bid along with the others. HTS's bid was the lowest among the five, so the city awarded the project to HTS.

JAL filed this action pursuant to ORS 279.067,[2] alleging that, because HTS had delivered its bid to Griffith's mailbox at City Hall rather than to the Public Works Building, the city should not have awarded the contract to HTS. JAL sought damages for the cost of preparing its bid and attorney fees.[3] Both parties moved for summary judgment, agreeing that HTS delivered its bid to City Hall rather than to the Public Works Building. The parties' motions thus presented the trial court with a purely legal question: whether the city legally awarded the contract to HTS.[4] The trial court concluded that the award was unlawful and therefore granted JAL's motion and denied the city's. We review the rulings on the cross-motions for summary judgment to determine which party, if either, is entitled to judgment as a matter of law. *Powell v. Bunn,* 185 Or App 334, 340, 59 P3d 559 (2002), *rev den,* 336 Or 60 (2003).

The process for awarding public contracts through competitive bidding is governed by ORS chapter 279 and model rules promulgated by the Oregon Attorney General. *See* ORS 279.049.[5] In general, and as pertinent to this case,

---

[2] ORS 279.067 provides, in part, that "[a]ny bidder or proposer adversely affected * * * may commence a suit in the circuit court for the county in which are located the principal offices of the public contracting agency, for the purpose of requiring compliance with, or prevention of violations of, ORS 279.011 to 279.063 * * *."

[3] JAL also asserted a claim for injunctive relief, which it withdrew at the hearing on the parties' motions for summary judgment provided that it prevailed on the damages issue.

[4] JAL also opposed the city's summary judgment motion on the alternative ground that factual disputes precluded a ruling in its favor. On appeal, JAL does not renew that argument to urge that, if summary judgment in its favor was error, the case should be remanded for trial. Nor would JAL succeed in such an argument. JAL asserted below that the city, as the moving party, had the burden to demonstrate the lack of a material dispute of fact. JAL was mistaken in that regard. Effective with the 1999 amendment to ORCP 47 C, the burden to produce evidence on any issue raised in the motion falls on the party opposing the summary judgment motion if that party has the burden of persuasion at trial. Or Laws 1999, ch 815, § 2; ORCP 47 C. JAL, as the plaintiff in this action, had the burden of persuasion at trial. Thus, it was JAL's burden, not the city's, to produce evidence demonstrating a dispute of fact as to any issue material to the city's motion.

[5] Unless a government agency or entity adopts rules of procedure that explicitly take the place of the Attorney General's model rules, the model rules apply.

the procedures for awarding public contracts can be divided into four categories of activities: (1) advertisement of the fact that the agency will accept bids for a public works contract; (2) a written "invitation for bids" that provides information about the project and the procedures for submitting bids;[6] (3) the preparation and submission of bids; and (4) the consideration of bids and the award of the contract by the public entity. The first two activities are informational in nature— that is, they concern the information that the government must provide to potentially interested bidders. The latter two have to do with the actual process by which bids are submitted and the successful bidder is selected.

Relatively few of the extensive provisions governing the public contracting process are concerned specifically with the delivery of bids. By statute, the information given to the public—*i.e.*, the advertisement and the written invitation— must include the "name and title of the person designated for receipt of bids[.]" ORS 279.025(2)(f); ORS 279.027(1)(f). The model rules have the same requirement, but supplement it by requiring the official's address to be listed. In particular, the advertisement must state the "address of the Agency person authorized to receive" bids. OAR 137-030-0015(2)(d)(E). The invitation for bids must include "[i]nstructions and information concerning submission requirements including the address of the office to which [bids] must be delivered and any other special information * * *." OAR 137-030-0010(3)(a)(D).

■     Nothing in the statutes or model rules governing the actual submission of bids requires delivery to be to a particular site or physical location. The model rules require only that bids be submitted in accordance with the invitation to

---

ORS 279.049(4), (5). In this instance, the city has supplemented the Attorney General's model rules through a provision that does not apply to this dispute. *See* Bend Municipal Code § 1.308 (providing special notice procedures for solicitation of bids when the city sells real property). The city has not, however, adopted rules that displace the Attorney General's model rules. Consequently, because the parties agree that ORS chapter 279 and the Attorney General's model rules provide the controlling legal principles, they have cast their arguments accordingly.

[6] Under the statutes and rules, "invitations to bid" also are referred to as "bid documents" and "solicitations" or "solicitation documents." For the sake of clarity, and because the city termed its bid document an "invitation for bids," we use that terminology consistently throughout this opinion.

bid. OAR 137-030-0020(1). The pertinent statute expressly requires only that bids must be "[f]iled with the *person* designated for receipt of bids by the public contracting agency" and says nothing about where that must occur. ORS 279.027(2)(b) (emphasis added). To be sure, the model rules also place the burden of delivery on the bidder by declaring that the bidder "is responsible for ensuring the [public entity] receives its [bid] at the required delivery point prior to the Closing, regardless of the method used to submit or transmit" the bid. OAR 137-030-0030(3). They further declare that the public entity "is not responsible for [bids] submitted in any manner, format or to any delivery point other than as required in the [invitation for bids]." OAR 137-030-0030(2)(b). But in and of themselves, neither the model rules nor the statutes impose a requirement for where delivery must occur; they require only that the bid be filed with the official designated to receive bids.

Thus, the statutes governing the documents that provide information to prospective bidders (*i.e.*, the advertisement and the invitation for bids) share a common requirement: the documents must specify the official designated to receive the bids. Their common focus, in other words, is on the person, not the place. The model rules add the requirement that the informational documents include the address of the official or the office where delivery must be made. The point of those additional requirements is to facilitate the delivery of bids to the person designated to receive them. By not including the physical address or location when specifying the requirements for actual submission of bids, the statutes and model rules demonstrate that their objective is to steer the bid, not to a particular building, but to a particular person.

That is not to say that delivery to the address specified in the invitation for bids is not in some sense a "requirement" with which bidders must comply. But the statutes and the model rules provide perspective on the significance of noncompliance with such a requirement when, as here, the bid is delivered to an office where the official maintains a mailbox and is accepted by an agent of the official. Is such delivery strict compliance? In this particular instance, it may be, inasmuch as the designated official (Bob Griffith) in fact

received the bid and had it in his personal possession before the time for receipt of bids closed. HTS's method and manner of delivery thus satisfied its responsibility, as expressed in the model rules, to ensure that the city received its bid before closing, "regardless of the method used to submit or transmit" the bid. OAR 137-030-0030(3).

■ Strict compliance, in all events, is not the applicable legal standard. The statutes require public contracts to be awarded to the "lowest responsible bidder," which means, as pertinent here, the lowest bidder who "substantially complied" with all prescribed bidding procedures and requirements. ORS 279.029(1), (6)(a)(A). Thus, even if strict compliance would require delivery of a bid to the address specified, rather than to an alternative official location, the question remains: Would the latter constitute substantial compliance? We conclude that it does. Substantial compliance is "compliance in respect to the essential matters necessary to assure every reasonable objective of the statute." *Schlumberger Technologies, Inc. v. Tri-Met*, 145 Or App 12, 17, 929 P2d 331 (1996), *rev den*, 325 Or 80 (1997) (internal quotation marks omitted). The key objectives of the public bidding process are to further "openness and impartiality to the maximum extent possible" in public contracting and to foster competition so that the state receives "optimal value" in its contractual arrangements. ORS 279.005(1); ORS 279.007(2). As the statutes and model rules make clear, what is essential to the public bidding process, in terms of the delivery of bids, is that they be received in a timely manner by the designated public official in such a way that they can be accurately identified, secured, and opened at the time and place designated for the public opening.

HTS's delivery of its bid served those essential aspects of the process. The bid was delivered to someone with authority to act as Griffith's agent at a place where Griffith had an official mailbox. The bid was stamped with time and date as the model rules require[7] and immediately placed in Griffith's box. Griffith in fact checked the box for mail before 11:00 a.m. that morning, when the bids closed, and took the bid into his physical possession. He was able to open it along

---

[7] OAR 137-030-0065(1).

with the other bids that were timely delivered to the city on the project. Under the facts of this case, to require HTS to deliver the bid to the Public Works Building or the training room, so that Griffith would obtain timely physical possession of it there instead of at City Hall, would do no more than place an excessive formality in the way of healthy competition. On the facts of this particular case, HTS substantially complied with the requirements of the bidding process and, as a result, the city was obligated to award the contract to HTS as the lowest bidder. *See Schlumberger Technologies, Inc.*, 145 Or App at 17 (substantial compliance necessarily depends on the facts of each particular case).[8]

JAL's arguments to the contrary are primarily based on the premise that, because HTS delivered its bid to City Hall rather than to the Public Works Building, it retained the ability to withdraw its bid at any time, either before or after the deadline for submission of bids. According to JAL, if HTS was not happy with the outcome of the bidding process because, for example, its bid was substantially lower than any of the others, the fact of its incorrect delivery provided grounds for it to withdraw its bid. JAL urges that, by "guarantee[ing] its ability to withdraw * * * from a potentially unprofitable project," HTS did not sufficiently evidence its intent to be bound. Such a result, according to JAL, seriously undermines the competitive nature of the bidding process.

That argument, however, has no support in the applicable law. Had HTS attempted to withdraw its bid after

---

[8] The evidence here demonstrates the point. Four of the five bidders took their bids to the Public Works Building. Although the invitation for bids stated that bids "will be accepted at the City of Bend Public Works Department Training Room by Bob Griffith, Purchasing Manager," none of those four, including JAL, actually delivered their bids either to Griffith or to the training room. Rather, all of the other bidders left their bids with an administrative assistant who recorded the date and time of submission and, presumably, then took steps to ensure that the bid reached Griffith. Similarly, HTS's representative went to City Hall with a properly addressed bid and told Harriman that he was not sure where he needed to take the bid. Harriman told him that she would accept the HTS bid and that she would place it in Griffith's mailbox at City Hall, knowing that Griffith checks that mailbox every day. Thus, none of the bidders literally complied with either the invitation for bids or ORS 279.027(2)(b) (bids must be filed with the person designated for receipt of bids). Still, their conduct was reasonably calculated to get their bids to Griffith. As such, all of the bidders, including HTS, substantially complied with the rules for delivery of bids set out in ORS 279.027(2)(b).

the bids were opened, it would not have succeeded. A bid is a firm offer, to be held open for the agency's acceptance for 30 days from closing unless the solicitation for bids specifies otherwise. OAR 137-030-0012(1); OAR 137-030-0080. Pursuant to the city's invitation for bids, bids could be withdrawn on written or telegraphic request of the bidder at any time *before* the public opening. But nothing in the invitation for bids permitted HTS to withdraw its bid after opening, nor would the model rules have permitted that.[9] In short, the statutes and rules govern the conditions under which withdrawal is permitted, and those conditions do not include misdelivery as occurred in this case. HTS thus gained no greater right of withdrawal simply because it delivered its bid to a different address than specified in the invitation for bids.

JAL also argues that Griffith's act of carrying the HTS bid from City Hall to the Public Works Building for the bid opening was a "capricious application" of its bidding requirements that undermined the impartiality of the process. In particular, JAL contends that, because Griffith knew who left the bid at City Hall (*i.e.*, HTS's name was on the outside of the sealed envelope), Griffith could exercise "unconditional discretion" either by ignoring the bid or by "rescuing" it.

As the official designated for receipt of the bids, however, Griffith had no discretion to engage in the kind of conduct that concerns JAL nor could he ignore any bid once he received it. Under ORS 279.029(1), the city was obligated to award the contract to the "lowest responsible bidder," meaning the bidder with the lowest bid who "[s]ubstantially complied with all prescribed public bidding procedures and requirements." ORS 279.029(6)(a)(A). As long as a bidder substantially complies with the invitation for bids and governing law—as we have concluded HTS did—the city has no

---

[9] Under the model rules, a bidder can withdraw its bid only if its notice of withdrawal is received by the agency *before closing*. OAR 137-030-0060(2)(a); *see* OAR 137-030-0000(5) (defining closing as "[t]he date and time announced in the invitation as the deadline for submitting Offers"). An attempt to withdraw a bid after closing is late, and the public entity "shall not" accept such a late request for withdrawal. OAR 137-030-0070. An exception exists for, among other things, certain kinds of mistakes. OAR 137-030-0075. HTS's misdelivery in this case would not have qualified as a mistake that would have permitted withdrawal after opening.

discretion to ignore the bid. Had the city done so, it would have been subject under ORS 279.067 to damages and possible injunctive relief.

For those reasons, we conclude that the city legally awarded the contract to HTS. The trial court therefore erred in granting JAL's motion for summary judgment and denying the city's motion for summary judgment.

Reversed and remanded with instructions to enter judgment for defendant City of Bend.