Argued and submitted November 22, 2006, affirmed May 16, 2007

COQUILLE SCHOOL DISTRICT 8,
*Plaintiff-Appellant,*

*v.*

Susan CASTILLO,
Superintendent of Public Instruction,
and the Department of Education,
*Defendants-Respondents.*

Marion County Circuit Court
04C17414; A128485

159 P3d 338

J. Kevin Shuba argued the cause for appellant. With him on the brief was Garrett, Hemann, Robertson, Jennings, Comstock & Trethewy, P.C.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondents. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge,* and Wollheim, Judge.

EDMONDS, P. J.

---

* Brewer, C. J., *vice* Linder, J.

**EDMONDS, P. J.**

This case involves the refusal of the State Superintendent of Public Instruction (the superintendent) to provide funding to Coquille School District 8 (the district) for a projected number of students anticipated to attend a school known as the Coquille-Oregon Independent Distance Education Academy (COR-IDEA), on the ground that the school did not qualify as a public charter school under state law. The district sought review of the superintendent's decision in the circuit court as an order in other than a contested case under ORS 183.484. After both parties moved for summary judgment, the circuit court denied the district's motion and granted the superintendent's motion under ORCP 47 C. The district appeals, and we affirm for the reasons explained below.

In April 2003, the district approved the charter for COR-IDEA. In December 2003, the district superintendent submitted to the state Department of Education the projected number of students who would be attending schools in the district for the 2004-05 school year. That estimate, which was revised in March 2004, included an anticipated 1,450 students enrolling in COR-IDEA during that school year. In a July 2004 letter to the district superintendent, the superintendent refused to provide funding for the students attending COR-IDEA on the ground that the school did not qualify as a public charter school. That refusal led to the proceedings outlined above.

Under the COR-IDEA charter,

"The mission of [COR-IDEA] is to provide resources and support to parents who have elected to educate their children in the home. * * * COR-IDEA brings a fresh approach of mutual trust among parents and schools in Oregon, by honoring and supporting parental choice in instructional materials and methodology based upon the needs of each and every individual child."

According to the charter, "[t]he COR-IDEA target students are those who are receiving education and educational support including curriculum, instruction and assessment through a home based educational program." In describing

the curriculum, the charter states: "As the teachers work with the families to develop the Individual Learning Plans (ILP's) for the students, care is taken to help the families choose grade level and course appropriate material that will allow the student to be successful in the selected course and grade level." Regarding assessment of students' learning, the charter explains, "Contact teachers are available to help parents in examining and choosing assessment options." "At the high school level," according to the charter, "the parent and student submit a plan to the contact teacher for coursework that permits the student flexibility while satisfying state learning goals for each course." The charter also provides that COR-IDEA "operates as a home based educational program. As such, many of the issues of student behavior and discipline procedures become the responsibility and venue of the parent and home." Finally, the charter states that the "COR-IDEA contact teacher is available to work together with the parent and student to choose content goals for the year as reported on the Individual Learning Plan (ILP)."

The COR-IDEA charter includes a proposed budget that assumes an enrollment of 1,500 students. That budget includes funding for 14 full-time-equivalent (FTE) "certificated" teachers, consisting of 12 general education teachers and two special education teachers. Under the charter, COR-IDEA "students and parents record hours worked by the students," and those records are "monitored" by teachers and staff. Parents submit a time sheet at least once every two weeks.

On appeal to this court, the district makes four assignments of error. We turn first to the district's fourth assignment, in which it makes a procedural challenge to the grant of summary judgment to the superintendent. Citing *Powell v. Bunn*, 185 Or App 334, 338-39, 59 P3d 559 (2002), *rev den*, 336 Or 60 (2003), the district asserts that "the general standard for summary judgment—viewing factual disputes in the light most favorable to a nonmoving party—prevents the [superintendent] from obtaining summary judgment on judicial review under ORS 183.484 where the facts in an administrative order are at issue." In a related argument, the district claims that the circuit court "erred as a matter of law in granting the Superintendent's summary

judgment [motion] prior to creation of a record as required under ORS 183.484."

In *Powell*, we addressed the interaction between the judicial review of an order in other than a contested case under ORS 183.484 and the summary judgment standard in ORCP 47 C. Under ORS 183.484(5)(c), the circuit court, in reviewing an order in other than a contested case, "shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record." That same provision states that "[s]ubstantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." On appeal of a judgment in a case involving such an order, the *Powell* court explained, "our function is to determine whether the circuit court correctly applied the standards of its review under ORS 183.484." 185 Or App at 338-39.

In contrast to the standard of review applicable to a proceeding that arises under ORS 183.484, a motion made under ORCP 47 implicates a different standard. Each party that moves for summary judgment under that rule has the burden of demonstrating that there are no material issues of fact and that the movant is entitled to judgment as a matter of law, after viewing the evidence and all reasonable inferences arising therefrom in the light most favorable to the nonmoving party. 185 Or App at 338.

In *Powell*, the plaintiff sought judicial review of the superintendent's order in circuit court pursuant to ORS 183.484, and also pleaded civil claims for declaratory and injunctive relief. As we observed in *Powell*, the summary judgment standard of review could be applied without difficulty to the issues on appeal arising out of the grant of summary judgment on the claims for declaratory and injunctive relief. We turned then to the judicial review of the superintendent's administrative order and initially observed that the summary judgment standard for viewing the evidence was inappropriate in light of the fact that our review of factual issues under ORS 183.484 is limited to whether the circuit court correctly decided that the superintendent's order was supported by substantial evidence. 185 Or App at 339. We concluded, however, that the conflicts in the standards of

review did not hamper our ability to review the superintendent's order in that case because the plaintiff did not challenge any of the superintendent's factual findings in the circuit court or on appeal as unsupported by the record. In other words, the summary judgment standard of review was appropriate to apply because

> "the parties were (and remain) in agreement that there were no disputed issues of material fact. Thus, although the standards of review that apply to the civil action and the review proceeding differ, ultimately they converge, because the inquiry for both is legal only."

185 Or App at 340.

This case, however, comes to us in a different posture from that in *Powell*. As noted, both parties filed cross-motions for summary judgment on the same ground. In its memorandum in support of its motion, the district asserted that the superintendent was not entitled to summary judgment "because its [*sic*] alleged facts are at issue." In its response to the superintendent's cross-motion, the district asserted that, "without a settled record, * * * summary judgment shouldn't be granted to" the superintendent.

What the district did not do, however, was identify for the circuit court what facts it disputed. At the hearing on the cross-motions for summary judgment, counsel for the district argued that the district was entitled to present evidence in the circuit court. But, in response to the court's question whether an evidentiary hearing would be required if it denied the cross-motions for summary judgment, counsel responded, "That is correct, Your Honor." Thus, the circuit court would have understood the district to argue that there was no issue of fact that would preclude summary judgment.

◼ Based on those circumstances, the superintendent contends that the district's fourth assignment of error is not properly preserved under ORAP 5.45 and that this court therefore should not address it.[1] *See, e.g.*, *State v. Wyatt*, 331

---

[1] ORAP 5.45(1) provides that

"[n]o matter claimed as error will be considered on appeal unless the claimed error was preserved in the lower court and is assigned as error in the opening brief in accordance with this rule, provided that the appellate court may consider an error apparent on the face of the record."

Or 335, 343, 15 P3d 22 (2000) (holding that a party must provide a trial court with an explanation of the party's position that is clear and specific enough to ensure that the court has the opportunity to identify its alleged error and correct it immediately before an issue is deemed preserved for appellate review). We agree with the superintendent. By taking the position that the circuit court should consider the cross-motions for summary judgment as a threshold matter and that it wanted an evidentiary hearing only in the event that the court denied the motions, the district effectively invited the circuit court to presume that there were no material facts in dispute and that it should rule as a matter of law. Although the district asserted in its supporting memorandum, in passing, that the "alleged facts are at issue," it did not make that claim in its motion, it did not plainly raise that issue in response to the superintendent's cross-motion, and it still has not identified—even on appeal—what facts it disputes. Under those circumstances, we conclude that the district has not satisfied the requirement of ORAP 5.45(1), that no matter claimed as error will be considered on appeal unless the claimed error was sufficiently raised in the lower court.

■ We also reject the district's complaint about the lack of an adequate record. In *Norden v. Water Resources Dept.*, 329 Or 641, 649, 996 P2d 958 (2000), the court held that, "[o]n judicial review of an order in other than a contested case proceeding, ORS 183.484 affords the parties the opportunity to develop a record [in the circuit court] like the one that parties are entitled to develop at an earlier stage in a contested case proceeding." Citing *Norden*, the district asserts that "a court cannot review a Final Order in other than a contested case for substantial evidence where there is no complete record to weigh the Order against." But as the quoted portion of the *Norden* opinion makes clear, all that is required is that the parties have an *opportunity* to develop a record in the circuit court. Here, the district does not argue that the trial court erred in denying it an opportunity to develop a record. Moreover, each party submitted evidence in support of its motion for summary judgment. For the above reasons, we reject the district's fourth assignment of error.

We turn next to the district's overarching argument that the superintendent had no authority to deny funding for

students enrolled in COR-IDEA. The district asserts that, under ORS chapter 338, the legislature intended to leave the organization and operation of public charter schools to local districts and that the superintendent has limited authority in those matters. Although the district recognizes the superintendent's "legal control of state funding," it contends that "the Department of Education has no discretion as to whether to fund a public charter school that has been approved by a local school district."

The superintendent responds that she has implicit and explicit authority over the distribution of funds to local school districts, a process that is governed by portions of ORS chapter 327, and she concludes that she has authority, in administering the State School Fund, "to determine from the charter agreement whether a purported 'public charter school' qualifies as a public charter school under ORS chapter 338." In her view, "[n]othing in the statutory scheme permits—much less requires—the superintendent * * * to distribute school funding based on students who are not enrolled in and attending a qualified charter public school."

■■ The issue as framed by the parties presents a question of statutory construction in which our task is to discern the intent of the legislature. We undertake that task by examining the text and context of the relevant statutes regarding the mechanics of state school funding, the superintendent's authority, and the formation and operation of charter schools.[2] Unless words in a statute are specifically defined by statute, we give them their ordinary and commonly understood meaning. Under settled principles of statutory construction, we will resort to legislative history and general maxims of statutory construction only if the legislature's intended meaning, based on text and context, is unclear. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1145 (1993) (describing methodology).

Public elementary and secondary school funding is governed by portions of ORS chapter 327. Public schools are funded primarily from two sources: distributions from the State School Fund and local property taxes. *See* ORS

---

[2] For a comprehensive description of the provisions authorizing public charter schools in Oregon, see Cindy Hunt, *Senate Bill 100: Creating Public School Choice Through Charter Schools*, 36 Willamette L Rev 265 (2000).

327.008(1) (establishing the State School Fund); ORS 327.013 (setting out calculation for State School Fund distributions). Each fiscal year, the legislature appropriates money to the State School Fund. ORS 327.008(1). Each school district receives a grant from the State School Fund, less funds from local revenue, that comprises a general purpose grant, a facility grant, a transportation grant, and a high cost disabilities grant. ORS 327.008(2). The bulk of the State School Fund grant that each district receives is contained in the general purpose grant. In turn, the general purpose grant is computed based in part on the district's "average daily membership," or "ADM." *See* ORS 327.006(1), (3) (defining ADM). School districts provide projections of the number of students they will have for each school year, and those projections are used to calculate the ADM. ORS 327.061(1). Distributions from the State School Fund are made to districts over the course of the year. ORS 327.095(1).

The legislature has granted broad powers to the superintendent regarding public education. The Department of Education functions under the control of the State Board of Education, "with the Superintendent of Public Instruction serving as an administrative officer for public school matters." ORS 326.111(1). Under ORS 326.111(3),

> "*All* administrative functions of the State Board of Education shall be exercised through the Department of Education, and the department shall exercise *all* administrative functions of the state relating to supervision, management and control of schools not conferred by law on some other agency."

(Emphasis added.) Indeed, the superintendent "shall exercise, under the direction of the State Board of Education, a general superintendence of school officers and the public schools." ORS 326.310. She also is charged with acting as the administrative officer of the State Board of Education and as the executive head of the Department of Education. The legislature has empowered the superintendent to "direct and supervise *all* activities of the department." ORS 326.310(1), (2) (emphasis added). Finally, regarding her general authority, the superintendent "shall":

"Assist all district school boards and education service district boards in answering questions concerning the proper administration of the school laws, the rules of the State Board of Education and the ministerial duties of school officers and teachers. The decision of the superintendent shall guide school officers and teachers in the performance of their duties relating to the matters decided. The superintendent may submit any question to the State Board of Education which shall then decide the question."

ORS 326.310(3).

In addition to her general plenary authority, the legislature has directed the superintendent to administer the State School Fund. ORS 327.125. Moreover, with respect to the annual projections of the number of students that school districts must make, ORS 327.061(1) provides, in part, that the "Department of Education shall verify all projections used for purposes of the distribution formula." If a district disagrees with the projection verified by the department, it may appeal that projection to the department. ORS 327.061(3). ORS chapter 327 also directs the superintendent to "adjust" distributions to school districts based on differences in anticipated local revenues and differences between a district's projected and actual enrollment. ORS 327.099(1), (2). In addition, the superintendent may adjust funds distributed in one year to reflect overpayments or underpayments in a previous year. ORS 327.101(1). Finally, the legislature has granted the superintendent express authority to withhold funds from a school district if the superintendent determines that a school district is not complying with the standards set by the State Board of Education's rules. Under ORS 327.103(2), the superintendent "may withhold portions of the State School Fund monies otherwise allocated to the school district for operating expenses until such deficiencies are corrected * * *."[3]

---

[3] Also, if, after an investigation, "the superintendent finds that there is a substantial basis to believe that [a] public charter school sponsors, financially supports or is actively involved with religious activity, the superintendent shall" withhold the district's State School Fund distribution and order the district to withhold funds from the public charter school. ORS 327.109(2).

By definition, a public charter school is "an elementary or secondary school offering a comprehensive instructional program operating under a written agreement entered into between a sponsor and an applicant and operating pursuant to" ORS chapter 338. ORS 338.005(2). The process of establishing a public charter school begins when an applicant submits a written proposal to a school district board. ORS 338.045(1). After holding a public hearing on the proposal, the school district board must either approve the proposal or state in writing its reasons for rejecting the proposal. ORS 338.055. If the proposal is not approved, the applicant may appeal the school district board's decision to the State Board of Education. ORS 338.055(4). If the proposal is approved, the school district board becomes the sponsor of the public charter school. ORS 338.065(1). Under ORS 338.065(1), "The sponsor and applicant shall develop a written charter that contains the provisions of the proposal that have been duly approved by the sponsor and public charter school governing body."

Although the formation of a public charter school is largely a matter of local concern, its operation is overseen to some extent by the State Board of Education. For example, ORS 338.115 exempts public charter schools from some laws that apply to other educational entities, but it states that other provisions—including laws that govern academic content standards and instructional standards—do apply. Moreover, a public charter school must report to its sponsor *and* to the State Board of Education at least annually on the performance of the school and its students. ORS 338.095(1) provides that "[a] public charter school shall disclose in its report information necessary to make a determination of compliance with the requirements of" ORS chapter 338. Also, a public charter school is subject to an annual audit, and the audit must be provided to the State Board of Education and the Department of Education. ORS 338.095(2). In addition, the State Board of Education may require public charter schools to file reports with the Department of Education to allow the board to gather information on public charter schools for inclusion in the Oregon Report Card. ORS 338.095(3).

With that background, we return to the district's contentions that the superintendent has no authority to deny

funding for students enrolled in COR-IDEA from the State School Fund distribution to the district. On appeal, the district frames the following questions:

"1. Did the trial court err in concluding that as a matter of law the State Superintendent of Public Instruction has the authority to withhold public funds from an approved public charter school operating in violation of ORS chapter 338?

"2. Did the court err in affirming the Superintendent's conclusion that COR-IDEA fails to meet the requirement of offering a 'comprehensive instruction program' as required by ORS 338.005(2)?

"3. Did the court err in concluding that as a matter of law COR-IDEA parents who act as volunteer instructors for their children are teachers for purposes of the requirements of ORS 338.135(7)?'"

We begin by analyzing the superintendent's statutory authority.

■■ "It is a fundamental principle of administrative law that an administrative body possesses only those powers that the legislature grants, and that it cannot exercise authority that it does not possess. * * * Instead, [its] powers are restricted to those conferred expressly by statute or by necessary implication." *Gaynor v. Board of Parole*, 165 Or App 609, 612, 996 P2d 1020 (2000) (citing *SAIF v. Shipley*, 326 Or 557, 561, 955 P2d 244 (1998), and *Campbell v. Bd. of Medical Exam.*, 16 Or App 381, 391-92, 518 P2d 1042, *rev den* (1974)). In the analysis that follows, we apply the above principles and determine that the superintendent acted within the scope of the authority granted to her by the legislature and that she correctly concluded that COR-IDEA did not meet the 50 percent licensure requirement in ORS 338.135(7)(c). As a result, we need not address whether COR-IDEA also failed to qualify as a public charter school on the ground that it did not offer a comprehensive instructional program.

■■ The beginning point of our analysis of the superintendent's authority is the language in ORS 327.061(1). It provides, in part, that the "Department of Education shall *verify* all projections used for purposes of the distribution formula." (Emphasis added.) The term "verify" is not defined by

statute, and it is a word of common usage. Accordingly, we give the word its "plain, natural, and ordinary meaning." *PGE*, 317 Or at 611. To verify is "to prove to be true : establish the truth of : conclusively demonstrate by presentation of facts or by sound reasoning or argument"; "to check or test the accuracy or exactness of : confirm the truth or truthfulness of by or as if by comparison with known data or a recognized standard or authority * * *." *Webster's Third New Int'l Dictionary* 2543 (unabridged ed 2002). Thus, ORS 327.061(1) requires the superintendent to test the truthfulness and accuracy of the district's projections and implicitly prohibits her from accepting district attendance projections at face value. Because of the statute's direction to the superintendent to verify such projections, in light of the other requirements of ORS chapter 338, it necessarily follows that she has the authority to adjust the amount of the State School Fund that is distributed to a district if a projected enrollment is not in compliance with state standards.

■ That understanding of the import of ORS 327.061(1) is bolstered by other statutes governing the superintendent's role in administering the State School Fund. The legislative directive to the superintendent to verify the districts' projections is consistent with her authority to adjust distributions based on differences in anticipated local revenues, differences between a district's projected and actual enrollment, and overpayments or underpayments in a previous year. Moreover, it is consistent with the superintendent's authority to withhold portions of the State School Fund if she determines that a school district is not complying with the standards set by the State Board of Education's rules. In short, the legislature has made it clear that the superintendent is to administer the State School Fund not just in a mechanical manner, taking all the information she receives from school districts at face value. Rather, the statutory scheme as a whole evidences an intent for the superintendent to take an active role in ensuring that State School Fund distributions are made in a manner consistent with state law.

■ While the district acknowledges the general authority of the superintendent as discussed above, it posits that the legislature intended to treat charter schools differently.

In its view, the superintendent lacks "authority to deny funding to an approved public charter school, *even if that school fails to meet all of the requirements of ORS chapter 338.*" (Emphasis in original.) Initially, we observe that the district has not directed us to any statute, nor has our research revealed any statute, that creates an express exception for public charter schools or that makes them exempt from the general statutory provisions authorizing the superintendent to administer school funding. If the legislature's intent regarding public charter schools is as the district suggests, it must be implicit in those statutes enacted by the legislature regarding the subject.

We therefore turn to the statutes that govern charter schools and the grounds relied on by the superintendent in determining that COR-IDEA does not qualify as a public charter school. In June 2004, a State Board of Education representative sent a letter to the district superintendent expressing the following "concern" about the proposed COR-IDEA school:

> "ORS 338.135 requires that at least 50% of the teachers in a charter school be licensed through the Teacher Standards and Practices Commission (TSPC). Charter school teachers not licensed with TSPC must register with TSPC under the provisions of ORS 342.125(5). As we understand your proposal, parents of students will provide instruction to their children in the home. The 'contact' teachers will not provide direct or indirect instruction to the students, nor will they provide direct oversight of the instruction that parents provide. The 'contact' teacher will not prepare, approve or review lessons provided by parents. As such, it appears that in addition to the 'contact' teachers, parents are also teachers and must be included in meeting the requirements of ORS 338.135."

The school district nonetheless included COR-IDEA students in its projected enrollment. In the order that the district challenges here, the superintendent concluded that COR-IDEA did not qualify as a public charter school because it did not meet the requirement in ORS 338.135(7)(c) that "at least one-half of the total full-time equivalent (FTE) teaching and administrative staff at the public charter school shall be

licensed by the" Teacher Standards and Practices Commission.[4] After the district sought review in the circuit court, the court concluded that the superintendent's interpretation of ORS 338.135 was correct:

> "[T]he parents are teachers under the charter and in order to comply with the law, at least fifty per cent of the parents need to be licensed by [TSPC]. Currently, COR-IDEA's charter does not contain this requirement and as such, does not operate in compliance with the law."

Despite the fact that "the COR-IDEA charter calls for parents to provide day-to-day instruction," the district continues to argue on appeal that "COR-IDEA cannot be in violation of ORS 338.135(7)(c) simply because it uses parents as unpaid, volunteer instructional assistants." At the core of the district's argument is the assertion that parents of students enrolled in the charter school should not be considered as "teaching staff" for purposes of ORS 338.135(7). We turn to that inquiry.

Before the provisions of ORS chapter 338 establishing public charter schools were enacted in 1999, all public school teachers had to be licensed. In 1999, in a bill that amended the primary bill authorizing public charter schools, the legislature created a "registry" especially for public charter school teachers. Or Laws 1999, ch 199, § 2. That provision, now codified at ORS 342.125(5), provides:

> "(5)(a) The Teacher Standards and Practices Commission shall establish a public charter school teacher registry. The commission shall require the applicant and the public charter school to jointly submit an application requesting registration as a public charter school teacher. The application shall include:

---

[4] The superintendent's order did not include that ground as a basis for the denial of funding. The parties, however, stipulated that the superintendent could have withdrawn her order and added that ground. That is, the parties stipulated that the superintendent's order

> "should be treated on judicial review as if it is based in part on (a) the Superintendent's conclusion that a public charter school qualifies for state funding only if at least 50% of its teaching and administrative staff are licensed by the state, as required by ORS 338.135(7); and (b) the Superintendent's finding that COR-IDEA did not comply with that licensing requirement."

We thus treat the superintendent's order as if it included that ground.

"(A) A description of the specific teaching position the applicant will fill;

"(B) A description of the background of the applicant that is relevant to the teaching position, including any post-secondary education or other experience; and

"(C) Documentation as required by the commission for the purposes of conducting a criminal records check as provided in ORS 181.534 and a background check through an interstate clearinghouse of revoked and suspended licenses.

"* * * * *

"(b) Subject to the results of the criminal records check and background check, the commission shall approve the application for registration. The commission may deny a request for registration only on the basis of the criminal records check or the background check through an interstate clearinghouse of revoked and suspended licenses. The registration is valid for three years and may be renewed upon joint application from the teacher and the public charter school.

"(c) A registration as a public charter school teacher qualifies its holder to accept the teaching position described in the application in the public charter school that submitted the application with the holder of the registration."

At the same time, the legislature enacted the 50 percent licensure requirement at issue here. Or Laws 1999, ch 199, § 1; Or Laws 1999, ch 200, § 17. ORS 338.135(7) provides:

"(7)(a) Notwithstanding ORS 342.173,[5] a public charter school may employ as an administrator a person who is not licensed by the Teacher Standards and Practices Commission.

"(b) Any person employed as a teacher in a public charter school shall be licensed or registered to teach by the Teacher Standards and Practices Commission.

[5] ORS 342.173 states generally that a school district that employs teachers or administrators who are not properly licensed will forfeit a portion of its State School Fund distribution.

"(c) Notwithstanding paragraph (a) or (b) of this subsection, *at least one-half of the total full-time equivalent (FTE) teaching* and administrative *staff at the public charter school shall be licensed* by the commission pursuant to ORS 342.135, 342.136, 342.138 or 342.140."

(Emphasis added.)

In sum, the legislature created a new vehicle for ensuring that unlicensed public charter school teachers were subject to background and criminal records checks, and it also required that, although only one-half of the teachers at a public charter school had to be licensed as provided in ORS 342.125, no one could teach in a public charter school who had not undergone a background and criminal records check. When the subsections of ORS 338.135(7) are read together, ORS 338.135(7)(a) allows public charter schools to employ unlicensed administrators and teachers. ORS 338.135(7)(b) requires that any teacher employed by a public charter school must be either licensed or registered, and ORS 338.135(7)(c), the provision at issue here, establishes that at least one-half of the total full-time "teaching and administrative staff" must be licensed. While that statutory scheme leaves room for unlicensed—but registered—persons to function as teachers within a public charter school, it operates to require that no less than 50 percent of the full-time teachers and administrative staff be licensed.

With that statutory background, we return to the district's contention that the parents who conduct the day-to-day instruction at COR-IDEA are not part of the "teaching staff" as that phrase is used in ORS 338.135(7)(c). As with the issue of the superintendent's statutory authority addressed above, the district's contention raises a question of legislative intent. We begin with the text of the statute. The phrase "teaching staff" is not defined in ORS chapter 338 and the district has not suggested that the legislature intended the phrase to have anything other than its plain meaning.

The staff of an institution are "the personnel responsible for the functioning of an institution or the establishment or the carrying out of an assigned task under an overall director or head * * * as **a :** the teaching and administrative personnel of an educational institution * * *." *Webster's* at

2219. To teach is "to show, instruct; * * * to cause to know a subject"; "to direct as an instructor : guide the studies of : conduct through a course of studies : give instruction to"; "to conduct instruction regularly in." *Id.* at 2346. Both words encompass broad categories of persons who perform a particular function, that is, persons who instruct students. The district does not dispute that, under COR-IDEA's charter, parents conduct the day-to-day instruction of students. It necessarily follows that, under the plain language of ORS 338.135(7)(c), the parents are—as the circuit court concluded—the teachers and are therefore subject to the 50 percent licensure requirement.

If any doubt remains regarding the legislature's intention in that regard, the legislative history underlying ORS 338.135(7) supports the superintendent's understanding of the legislature's intent. *See* ORS 174.020 (addressing the consideration of legislative history). Representative Ron Sunseri, who sponsored HB 2550 (the bill that added teacher licensure requirements to the primary bill creating public charter schools), explained to the Senate Committee on Education that the amendments were intended to ensure that *everyone providing instruction* to students at a public charter school will be subject to a criminal background check by the TSPC:

> "REP. SUNSERI: [W]e think it is essential to have everyone who works at a charter school to be thoroughly checked and the background checks are essential * * *. So I think this [is] excellent. What we're doing is we're requiring TSPC to do the background checks on all applicants and those that are not part of the 50 percent licensure will still have this background check. That then becomes the basis for registration and these people will also be registered with TSPC.
>
> "CHAIR HARTUNG: Excuse me, Ron, so the registered teachers will have the same background check that a regularly licensed teacher would have?
>
> "REP. SUNSERI: That's correct."

Tape Recording, Senate Committee on Education, HB 2550, May 19, 1999, Tape 101, Side A (testimony of Rep Ron Sunseri).

In contrast, under the district's view, parent instructors would not be subject to background checks, because they are not part of the "teaching staff." But, that construction of the statute is inconsistent with the legislative intent that all persons instructing students in a public charter school be subject to a background investigation.

In summary, the district does not dispute that, if parents performing the day-to-day instruction are required to be treated as part of the teaching staff under state law, then the school's charter does not meet the statutory requirement that "at least one-half of the total full-time equivalent (FTE) teaching and administrative staff at the public charter school shall be licensed * * *." Our review of the text and context of the above statutes, together with their underlying legislative history, convinces us that the legislature intended that very result. Because COR-IDEA does not meet the statutory requirements of ORS chapter 338, the superintendent correctly determined that it does not qualify as a "public charter school." We hold, therefore, that the superintendent acted within the authority granted to her by the legislature when she refused to distribute State School Fund monies for students who would not be attending a qualified public charter school.

Affirmed.